1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DUNDELL WRIGHT,

11            Petitioner,               No. CIV S-09-3347 MCE EFB P

12        vs.

13   A. HEDGPETH,

14            Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2003 judgment of

18   conviction entered against him in the Sacramento County Superior Court on a charge of second

19   degree murder of a police officer while in the performance of his duties, with an enhancement

20   for use of a firearm.  Petitioner raises fifteen separate grounds for federal habeas relief.  Upon

21   careful consideration of the record and the applicable law, the undersigned recommends that

22   petitioner's application for habeas corpus relief be denied.

23   ////

24   ////

25   ////

26   ////

1

I.     **Factual Background[1]**

A jury convicted defendant of second degree murder (Pen.Code, § 187, subd. (a), § 189), finding that he personally discharged a firearm in the commission of the offense (Pen.Code, § 12022.53, subd. (d)) and murdered a peace officer in the performance of his duties (Pen.Code, § 190, subd. (c)).  The trial court sentenced defendant to state prison for a term of life without parole for the murder, and to 25 years to life for defendant's use of a firearm.  Defendant appeals, raising various claims of evidentiary and instructional error.  He also challenges the sufficiency of the evidence to support the murder verdict, contends the court erred in denying his change of venue motion, maintains he was deprived of due process when his sentence was increased based on an enhancement that was not alleged in the information, and contends his sentence and the lack of a trial on mitigating circumstances violate equal protection.  We shall affirm the judgment.

**FACTS**

On February 9, 1999, defendant was a "parolee at large," with a warrant out for his arrest based on his failure to report to his parole agent.  As conditions of his parole he could not possess any weapons and was required to submit to monthly drug testing.  On November 2, 1998, defendant gave a urine sample and told his parole officer he was not sure it would be clean.  Defendant did not contact his parole agent as required after the test.  In February 1999, the parole agent saw defendant at the Arden Fair Mall and told him to come to the parole office and work it out.  It was "not a big deal."

Two days later, on February 9, 1999, defendant, while in possession of a firearm, rented an Oldsmobile Cutlass from Robert Mapp.  He used cocaine as payment.  Mapp gave defendant a written note confirming that he had rented the car to defendant.  Minutes after defendant drove away with the car, Mapp heard gunshots.  Defendant had fatally shot Sacramento Police Officer William Bean, Jr., while Bean was on patrol in Del Paso Heights.

The evening of February 9, 1999, Officers David Hogge and Bean were working a routine shift in Del Paso Heights and had spent much of the evening running the license plate numbers of various vehicles to see if they were stolen.  At 8:17 p.m., they observed a car being driven by defendant, ran the license plate number and discovered the vehicle was not stolen; it belonged to a couple in Elverta.  Suspicious, Hogge looked for equipment violations and

---

[1] In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

noticed that the windshield was cracked, and that the crack extended from the driver's side across toward the passenger's side. Based on the windshield crack, the officers decided to stop the vehicle.

Hogge, who was driving, turned on the overhead lights and defendant pulled over. Hogge approached defendant while Bean provided cover. Hogge asked defendant who owned the car, and defendant replied he had permission from a friend to drive it and showed Hogge the note from Mapp. Defendant identified himself as Christopher Wright and denied having any identification or a driver's license. The officers asked defendant to get out of the car. When Hogge took a step back to give defendant room to exit, defendant slammed the gearshift into drive and sped away.

The officers ran back to their car and gave chase, activating their lights and siren, and notifying dispatch that they were involved in a pursuit. Hogge noticed that defendant's car was slowing down; it coasted through a stop sign. Suspecting that defendant might have stalled the car, Hogge turned off the siren to listen for defendant's motor. It sounded as if the engine was not running and defendant was attempting to restart the car.

The officers followed defendant until he pulled his vehicle next to an open field. Anticipating that they would have to chase defendant, Hogge asked Bean, "Do you got [ sic ] him Bill?" Hogge saw defendant open his car door and heard Bean cracking open his car door. Defendant had a gun in his hand, and Hogge yelled "gun" to alert Bean to the danger. Hogge, who thought he had placed the car into park, got out, stayed low and heard several shots to the right. He heard four to seven shots when defendant got out of his car. Hogge realized his car was not in park as it was still moving, which meant he could not use the car for cover. Hogge then noticed that Bean was lying on the ground on his back, pleading, "Oh God, oh God, help me."

Hogge spotted defendant running northbound and began to chase him, shooting as he ran. He also used his hand radio to report that Bean had been shot and needed an ambulance. Hogge saw defendant run between a house and a vehicle before Hogge lost sight of him. He formed part of a perimeter by standing at a nearby corner and when other officers arrived, Hogge pointed out defendant's last location. A sergeant informed Hogge that they needed to pull him from the scene.

When Sergeant Timothy Hunter responded to the scene, he discovered Bean was not moving and was unresponsive. He called for life flight. Bean's gun was still in his holster and was fully loaded, indicating it had not been fired. Hunter testified Hogge was upset, but in control.

3

Around 1:30 a.m., Sergeant David Kidd and SWAT team members located defendant hiding in a backyard with a nine-millimeter Glock handgun at his feet.

Detective Toni Winfield was a lead investigator of the shooting. She interviewed Hogge around 11:45 p.m. the night of the shooting. She observed that Hogge was devastated; he had a difficult time with his words, was emotionless, and appeared to be in shock. When Winfield learned that a suspect had been apprehended, she took Hogge for an in-field identification. Hogge positively identified defendant as the man who shot Bean. Hogge told Winfield he shot while he was in the field, but he was confused and struggling. Another officer reported Hogge said, "Oh God, I don't remember now for sure if I saw a gun or not." It was unclear exactly the time frame to which Hogge was referring.

Hogge surrendered his Sig Sauer .226, nine-millimeter semiautomatic handgun and magazine to Sergeant Richard Gardella. Gardella determined that seven rounds were missing.

Winfield's partner, Detective Jeffrey Gardner, was in charge of the crime scene investigation. When he arrived at the scene, he noticed that Hogge's patrol car had come to rest against a street sign, and the lights were still on. The car was in drive. Defendant's vehicle was stopped on the sidewalk and the front passenger door had a partially shattered window.

Gardner took control of the Glock handgun that had been found near defendant. It had a scratched out serial number, a live round in the chamber, and two other rounds in the magazine. Officers found nine shell casings; four were near defendant's car and five were in the nearby field, three of which were on the north side of defendant's car. According to Gardner, six casings came from Hogge's gun and three were from the Glock. Of the three shots from the Glock, one bullet went through the window of defendant's car, one went into a house across the street, and one killed Bean.

Defendant had gunshot residue on his right hand, which indicated he had fired a weapon or handled one that had recently been fired.

Bean died from a gunshot wound to the chest. The trajectory of the bullet was downwards. The bullet entered the back of Bean's left tricep, went through the muscle to the thoracic cavity, fracturing a rib, then traveled to his lung lobe, severing the aorta and striking the spinal column. It then hit the azygos vein and traveled to the lower lung lobe, fracturing another rib. It was an unsurvivable injury. Once the cardiovascular system is breached, blood pressure drops to zero, and the patient has about 10 to 15 seconds of cerebral function and, in this case, instant paralysis from the waist down.

Bruce Moran, a criminalist and expert in firearms, tool marks, and crime scene reconstruction, opined three of the discovered shell casings were fired from the retrieved Glock.  Due to the poor reproducing identifiable marks of polygonal rifled bores, he was unable to positively identify the Glock as the gun that fired the fatal shot, but it could not be eliminated.  He was able to eliminate Hogge's weapon as firing the fatal shot.  Although he originally believed the Glock had been fired from inside the car, he ultimately concluded it was fired from outside.  The most practical scenario was that the shot that hit defendant's car was fired from about 12 feet away.  Two shots from the Glock were fired close together; either the shooter was stationary or not moving much.  The shell casing from what was probably the fatal shot was not found where it should be if the shooter had just stepped from the car, but the casing could have been inadvertently moved.   Moran found nothing that was inconsistent with the defense theory that defendant got out of the car, ran into the field, Hogge fired four shots, defendant returned fire and fell, got up and fired twice more.

Hogge had been involved in a prior shooting of a man named Scott Allen in 1994.  Hogge described the incident.  He had his neighbor with him on a ride-along one night.  Two white males drove by and the driver either "flipped [Hogge] off" or mouthed "F-you."  Hogge made a U-turn, saw an equipment violation, and attempted to pull the car over.  The car sped off at a high rate of speed and eventually turned into a court where it ran into a mailbox cluster.  When Hogge stepped out of his car, he saw a muzzle flash.  He yelled "gun, shotgun" to his ride-along.   The driver charged Hogge, firing.  Hogge shot him several times, although he did not remember shooting.  He was finally able to get his radio and call for backup.  When Hogge returned to the scene later, it was not as he remembered it; he did not recall returning fire right away.  Hogge explained that when someone is shooting at him, the adrenaline rush of police work is gone; he shuts down and his training takes over.  He does not think; he simply reacts.

The defense called several people who lived near the shooting.  They testified they heard three or four rapid shots that night.  One neighbor testified she heard arguing, then shooting.

Defendant testified on his own behalf.  He denied knowing that he was a parolee at large.  He owned a nine-millimeter Glock although he knew he was not permitted to own weapons.  At about 8:00 pm on February 9, he was driving down Grand Avenue when the police stopped him.   He had the gun in his waistband.  Hogge asked him who owned the car and defendant gave him the note.  Bean said, "let's go," but Hogge was upset.  He told Bean to cover him.  Hogge said, "I could kill this motherfucker and it would be one less nigger society would have to deal with."   Bean said, "get the hell out of here."  When Hogge stepped back from the car, defendant took off.

5

At the second stop, the officers got out first.  Defendant got out and walked towards the officers "to see what the problem was."  He heard screaming; Bean said to Hogge, "What the hell is your problem?  What are you doing?"  Defendant took off running.  Hogge fired at him.  Defendant ducked, pulled out his gun and fired.  He ran into the field and fell, getting mud on his pants.  He got up and ran.  Hogge fired again and defendant returned two shots.  Hogge fired two or three more times while defendant ran.  Defendant did not mean to shoot anyone; he was positive that Hogge shot first.

John Thornton, a forensic scientist and expert on crime scene reconstruction, testified for the defense.  He did an ejection pattern test on Hogge's gun; the Sig Sauer had a more consistent ejection pattern than the Glock.  Thornton agreed with Moran's findings on the shell casings; three were from the Glock and six from the Sig Sauer.  He believed the car defendant was driving was moved after the shooting, based on the location of the broken glass from the passenger window.  In his opinion, the physical evidence was not consistent with Hogge's testimony that he heard four to seven shots within one or two seconds after defendant got out of the car.  One cartridge from the Glock was near a lamp post and two were in the field.  If the neighbors' testimony about three or four shots in rapid succession was true, he could rule out the Glock as the source of those shots.  Thornton agreed the fatal shot came from the Glock.  He could not say if four shots from the Sig Sauer were fired in rapid succession; there was some movement of the shooter.  Thornton agreed there were a number of plausible explanations for where the shell casings ended up, including the possibility that someone kicked them.

The prosecution argued the case came down to whom the jury believed: Hogge or defendant.   Although Hogge was mistaken about the number of shots defendant fired, the prosecutor argued he was more credible.  Defendant's version of events, especially that he walked towards the officers when he got out of his car, did not match the testimony of the defense expert Thornton.

The defense was self-defense, that Hogge fired first and then lied about what happened that night.

The jury deliberated over seven days.  The jury asked several questions, and at one point appeared deadlocked.  After further instruction and a few more days of deliberation, the jury reached its verdict.

Dckt. No. 18 at 99-108.

////

6

1
**II.       Procedural Background**

2          Petitioner filed a timely appeal of his conviction in the California Court of Appeal for the

3  Third Appellate District.  Resp.'s Lodg. Docs. 1, 2, 3.  Therein, he raised the first eleven claims

4  contained in the instant petition.  *Id.*  The Court of Appeal affirmed petitioner's judgment of

5  conviction in its entirety in a reasoned decision on the merits of petitioner's claims.  Resp.'s

6  Lodg. Doc. 7.  On August 1, 2007, petitioner filed a petition for review in the California

7  Supreme Court.  Resp.'s Lodg. Doc. 8.  That petition was summarily denied by order dated

8  October 17, 2007.  Resp.'s Lodg. Doc. 9.

9          On January 6, 2009, petitioner filed a petition for writ of habeas corpus in the California

10  Superior Court.  Resp.'s Lodg. Doc. 10.  Therein, petitioner claimed that his trial and appellate

11  counsel rendered ineffective assistance, that the trial court violated his Sixth Amendment right to

12  counsel when it denied his motion for substitution of counsel, and that the cumulative effect of

13  errors at his trial violated his right to due process.  *Id.*  The Superior Court denied that petition in

14  a decision on the merits of petitioner's claims.  Resp.'s Lodg. Doc. 11.

15          On May 4, 2009, petitioner filed a petition for writ of habeas corpus in the California

16  Court of Appeal for the Third Appellate District, in which he raised the same claims contained in

17  his habeas petition filed in the California Superior Court.  Resp.'s Lodg. Doc. 12.  The Court of

18  Appeal summarily denied that petition by order dated May 14, 2009.  Resp.'s Lodg. Doc. 13.

19  Petitioner subsequently raised the same claims in a petition for writ of habeas corpus filed in the

20  California Supreme Court.  Resp.'s Lodg. Doc. 14; Pet'r's June 30, 2011 "Exhibits," at 1.  The

21  Supreme Court denied that petition on November 10, 2009 with a citation to *In re Swain*, 34

22  Cal.2d 300, 304 (1949) ("We are entitled to and we do require of a convicted defendant that he

23  allege with particularity the facts upon which he would have a final judgment overturned and

24  that he fully disclose his reasons for delaying in the presentation of those facts").  Resp.'s Lodg.

25  Doc. 15.

26  ////

7

1    Petitioner filed his federal habeas petition in this court on December 2, 2009.

2  Respondent filed an answer on June 30, 2010.

3  **III.    Analysis**

4        **A.  Standards for a Writ of Habeas Corpus**

5    An application for a writ of habeas corpus by a person in custody under a judgment of a

6  state court can be granted only for violations of the Constitution or laws of the United States.  28

7  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

8  application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

9  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

10  2000).

11    Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

12  corpus relief:

13            An application for a writ of habeas corpus on behalf of a
           person in custody pursuant to the judgment of a State court shall
14         not be granted with respect to any claim that was adjudicated on
           the merits in State court proceedings unless the adjudication of the
15         claim -

16            (1) resulted in a decision that was contrary to, or involved
           an unreasonable application of, clearly established Federal law, as
17         determined by the Supreme Court of the United States; or

18            (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
19         State court proceeding.

20    For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

21  holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v.*

22  *Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06

23  (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

24  clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d

25  at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010))

26  ////

1   A state court decision is "contrary to" clearly established federal law if it applies a rule

2   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

3   precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

4   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

5   the writ if the state court identifies the correct governing legal principle from the Supreme

6   Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2]

7   *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

8   F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

9   simply because that court concludes in its independent judgment that the relevant state-court

10  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

11  application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v.*

12  *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

13  habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

14  the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

15  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

16  of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

17  (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

18  condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

19  state court's ruling on the claim being presented in federal court was so lacking in justification

20  that there was an error well understood and comprehended in existing law beyond any possibility

21  for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

22  If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

23  court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

---

24

25      [2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011)
26  (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

9

1   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

2   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

3   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

4   considering de novo the constitutional issues raised.").

5          The court looks to the last reasoned state court decision as the basis for the state court

6   judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

7   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

8   previous state court decision, this court may consider both decisions to ascertain the reasoning of

9   the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

10  a federal claim has been presented to a state court and the state court has denied relief, it may be

11  presumed that the state court adjudicated the claim on the merits in the absence of any indication

12  or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85.  This

13  presumption may be overcome by a showing "there is reason to think some other explanation for

14  the state court's decision is more likely." *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

15  803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to

16  support its conclusion, a federal habeas court independently reviews the record to determine

17  whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

18  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

19  review of the constitutional issue, but rather, the only method by which we can determine

20  whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.

21  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

22  there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

23          When it is clear, however, that a state court has not reached the merits of a petitioner's

24  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

25  habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

26  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

10

**B.  Petitioner's Claims**

**1.  Improper Exclusion of Evidence**

**a.  Exclusion of Expert Testimony from Peter Scharf**

In his first two grounds for relief, petitioner challenges the trial court's refusal to allow him to introduce expert testimony from Dr. Peter Scharf about proper police procedures.  Dckt. No.1 at 10-36.  In claim one, petitioner argues that the trial court's decision to exclude testimony from Dr. Scharf concerning "whether the police were legally engaged in performance of their duties," and whether "the police were violating various police operations standards," prevented him from presenting his defense, in violation of his Fourteenth Amendment right to due process and his Sixth Amendment rights to confrontation and compulsory process. *Id.* at 10.  In claim two, petitioner contends that the trial court erroneously applied Cal. Evid. Code § 352 to exclude the testimony of Dr. Scharf on these two subjects, in violation of his Fourteenth Amendment right to due process. *Id.* at 27-36.

The California Court of Appeal rejected these arguments, reasoning as follows:

> Defendant contends the trial court's refusal to permit defendant to introduce expert testimony relating to proper police procedures thwarted his ability to present a defense, depriving him of due process.  He asserts the court's ruling also violated defendant's Sixth Amendment right to confrontation and to compulsory process to obtain witnesses in his favor.  He further contends the trial court erred in relying on Evidence Code section 352 to exclude the evidence because the dangers of prejudice, confusion and the undue consumption of time did not outweigh the evidence's probative value.

> Defendant proposed to call Peter Scharf, Ed.D., a recognized expert in the parameter of the permissible use of force by law enforcement officers.  Dr. Scharf would render opinions as to whether the tactics employed by Hogge and Bean were consistent with Peace Officers Standards and Training (POST); whether Hogge's tactics were consistent with use of force standards; whether Hogge violated these standards in other encounters; whether Hogge and Bean received proper training; and whether the tactics used contributed to Bean's death.

////

At the beginning of trial, the parties disputed the relevance of Dr. Scharf's testimony.  The trial court deferred ruling on the admissibility of Dr. Scharf's testimony until after presentation of the People's case.

After the People's case, the trial court held a hearing pursuant to Evidence Code section 402 to determine the admissibility of Scharf's testimony.  Defendant made an offer of proof that Scharf would testify whether the police tactics used were consistent with POST and the National Law Enforcement Professional Standards.  Counsel identified the improper tactics on which he would seek an opinion: (1) absence of a radio call concerning the initial stop; (2) Bean jumping from a moving car; (3) failure to call in adequate back-up; (4) the failure to obtain supervisory guidance for the pursuit; (5) failure to develop a plan for the vehicle stop; (6) rushing the scene and escalating the situation at the second stop; (7) Hogge allegedly firing first; (8) Hogge making derogatory remarks to defendant at the first stop; and (9) Hogge using deadly force when defendant ran.

The prosecutor argued this evidence was not relevant.  Defense counsel countered it was relevant to impeach Hogge.  Hogge had testified that when shooting began his mind shut down and he reverted to his training.  The defense wanted to show Hogge overreacted and fired first; he was now lying to cover up shooting without a proper justification.  For this defense, they needed an expert to testify as to what an officer should do.  Further, Hogge's use of excessive force gave defendant a justification to use force; it might not rise to self-defense, but it was relevant to imperfect self-defense.

The trial court stated the jury would be instructed on proper police standards in the context of a detention or arrest, and it was improper for the jury to receive an expert opinion on that.  The court noted that many of the POST standards address officer safety; these standards have nothing to do with the case or with the use of excessive force.  They might be relevant in a civil liability case, but not a criminal case.  The court found attacking Hogge's credibility by showing that he violated standards had little probative value and would likely confuse and mislead the jury as to the proper standard to evaluate the parties' behavior.  The slight relevance of Dr. Scharf's testimony was outweighed by the potential for confusion and the prejudicial effect of the evidence.

Later defendant asked the court to reconsider its ruling.  The court confirmed its earlier ruling that any probative value of Dr. Scharf's testimony was outweighed by its potential for prejudice and confusion.

////

Defendant contends the trial court erred in its ruling because Scharf's testimony was relevant evidence and essential to the defense. It was relevant on the issue of whether the officers were engaged in the performance of their duties. It is a long-standing rule that one "cannot be convicted of an offense against a peace officer 'engaged in . . . the performance of . . . duties' unless the officer was acting lawfully at the time. [Citations.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217, italics in original.) In arguing the trial court abused its discretion in excluding Dr. Scharf's testimony, defendant relies on *People v. McDonald* (1984) 37 Cal.3d 351, *overruled on another point in People v. Mendosa* (2002) 23 Cal.4th 896, at page 914, which held the trial court prejudicially abused its discretion in excluding a defense expert from testifying about the psychological factors which affect the accuracy of eyewitness identifications.

"A trial court has broad discretion in determining whether to admit expert testimony and its ruling will be reversed on appeal only where the record reveals an abuse of discretion. [Citations.]" (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1205.) We find no abuse of discretion.

Expert opinion testimony is admissible if it relates "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid.Code, § 801, subd. (a).) "[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ( *People v. Cole* (1956) 47 Cal.2d 99, 103.)

While in the abstract proper police procedures may be beyond common experience, here the jury was given detailed instructions on the subject. The extensive scope of the instructions distinguishes this case from *McDonald*, in which the trial court gave only the standard instruction on discrepancies in testimony which did not mention the specific data on eyewitness identification on which the expert proposed to testify. (*People v. McDonald, supra*, 37 Cal.3d at p. 372.)

The court instructed on reasonable and excessive force by a peace officer and the defendant's right to use reasonable force in response to excessive force. The phrase "in the performance of his duties" was defined for the jury. The court defined the reasonable cause necessary for an arrest and the standards for a lawful detention. The jury was further instructed that it is not a crime to resist nonviolently an unlawful police action, but that if during such flight the person commits a new and distinct crime, the officer may legally detain or arrest him. The court detailed four

different Vehicle Code violations, fleeing a pursuing officer, failing to obey a traffic signal, exhibiting speed, and operating a motor vehicle with a defective windshield that impairs the driver's vision.

The court instructed the jury: "A peace officer is not engaged in the performance of his duties if he makes or attempts to make an unlawful arrest or detention or uses unreasonable or excessive force in making or attempting to make the arrest or detention.  [¶] If you have a reasonable doubt that the peace officer was making or attempting to make a lawful arrest or detention or using reasonable force in making or attempting to make the arrest or detention, and thus a reasonable doubt that the officer was engaged in the performance of his duties, you must find the defendant not guilty of any allegation which includes an element that the peace officer was engaged in the performance of his duties.  [¶]  If you have a reasonable doubt that Officer Hogge was acting in an unlawful manner or was using unreasonable force in the performance of his duties, then you must find that Officer Bean and Officer Hogge were acting unlawfully in the performance of their duties at that time."

The court also instructed fully on perfect and imperfect self-defense.

Far from depriving defendant of his defense, the trial court fully instructed on every aspect of that defense.  The jury was given the standards to determine if Hogge was acting in performance of his duties and was told of defendant's right to self-defense and to use reasonable force in the face of excessive police force.  The issues defendant sought to raise were completely before the jury.  Defendant's claim that his constitutional rights to present a defense were violated fails.

In exercising its discretion, the trial court was properly concerned that Dr. Scharf's testimony could confuse the jury as to the proper standards to apply.  Some of the police tactics Dr. Scharf criticized addressed officer safety, such as getting out of the car before it fully stopped and failing to radio in the initial traffic stop.  These tactics could not be construed as unlawful actions that would negate a finding the officers were engaged in the performance of their duties, and thus were irrelevant to any issue in the case.

Defendant further contends Dr. Scharf's testimony was relevant to impeach Hogge's testimony that once there was actual shooting he relied on his training in the situation.  Hogge was the prosecution's only percipient witness to the shooting and attacking his credibility was fundamental to the defense.

////

14

The trial court found little probative value in this use of Dr. Scharf's testimony.  We agree.  Some of the alleged violations of procedure had little, if any, impeachment value.  Hogge admitted he would criticize a rookie officer for failing to call in the initial stop.  Further, Hogge testified he fell back on his training when "it has turned into someone actually shooting at me."  Dr. Scharf's criticisms of Hogge's actions from the point shots were fired were based on defendant's version of events, that Hogge fired first while defendant ran.  The two competing versions of events, and the legal consequence if Hogge fired first, were before the jury.

"When expert testimony is offered, much must be left to the trial court's discretion. [Citation.]"  (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.)  In carefully considering the relevance and possibility of confusion of Dr. Scharf's testimony, given the full instructions on the issue and Dr. Scharf's reliance on officer safety rules as procedural violations, the trial court did not abuse its discretion in excluding Dr. Scharf's testimony.

Dckt. No. 18 at 110-17.

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense; this right is "a fundamental element of due process of law."  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  *See also Crane v. Kentucky*, 476 U.S. 683, 687, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972); *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009).  A defendant's right to present a defense stems both from the Fourteenth Amendment right to due process and the Sixth Amendment right "to have compulsory process for obtaining witnesses in his favor."  *Moses*, 555 F.3d at 757.  A state violates the Sixth Amendment when it arbitrarily denies a defendant the right to put on the stand a witness whose testimony "would have been relevant and material to the defense."  *Washington*, 388 U.S. at 23.

It is well-established, however, that "the right to present relevant testimony is not without limitation.  The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'"  *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)).  A criminal defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the

15

1    ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302.  Thus, a criminal defendant

2    "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or

3    otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410,

4    108 S.Ct. 646, 98 L.Ed.2d 798 (1988).  "Even relevant and reliable evidence can be excluded

5    when the state interest is strong." *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983).

6          A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief

7    only if it renders the state proceedings so fundamentally unfair as to violate due process.

8    *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th

9    Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  A state law justification

10   for exclusion of evidence does not abridge a criminal defendant's right to present a defense

11   unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the

12   accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  *See also Crane*, 476 U.S. at 689-

13   91 (discussion of the tension between the discretion of state courts to exclude evidence at trial

14   and the federal constitutional right to "present a complete defense"); *Greene v. Lambert*, 288

15   F.3d 1081, 1090 (9th Cir. 2002).  "The Supreme Court has indicated its approval of

16   'well-established rules of evidence [that] permit trial judges to exclude evidence if its probative

17   value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

18   potential to mislead the jury.'" *Moses*, 555 F.3d at 757.  "A habeas petitioner bears a heavy

19   burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*,

20   404 F.3d 1159, 1172 (9th Cir. 2005).

21         Petitioner is claiming, in essence, that the trial court's discretionary determination to

22   exclude the testimony of Dr. Scharf violated his federal constitutional rights.  The United States

23   Supreme Court has not "squarely addressed" whether a state court's exercise of discretion to

24   exclude expert testimony violates a criminal defendant's right to present relevant evidence.  *See*

25   *Moses*, 555 F.3d at 758, 760.  Accordingly, the decision of the California Court of Appeal that

26   the trial court's evidentiary ruling did not violate the Due Process Clause is not contrary to or an

16

1    unreasonable application of clearly established United States Supreme Court precedent and may

2    not be set aside.  *Id.*[3]  *See also Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (per curiam)

3    (relief is "unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions "given

4    no clear answer to the question presented, let alone one in [the petitioner's] favor," because the

5    state court cannot be said to have unreasonably applied clearly established Federal law).[4]

6            Assuming arguendo that the state court erred under federal circuit law in excluding the

7    testimony of Dr. Scharf, petitioner must still show that the error "had a substantial and injurious

8    effect or influence in determining the jury's verdict" and that petitioner suffered actual prejudice,

9    defined as a "reasonable probability" that the jury would have reached a different result but for

10   the error.  *See Clark v. Brown*, 450 F.3d 898, 916 (9th Cir. 2006) (citing *Brecht v. Abrahamson*,

11   507 U.S. 619, 637 (1993)).  *See also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (in § 2254

12   habeas proceeding, federal court must assess prejudicial impact of constitutional error under

13   *Brecht* "substantial and injurious effect" standard).

14           For the reasons described by the California Court of Appeal, petitioner has failed to

15   demonstrate that he was precluded from presenting his defense.  Petitioner's defense theory was

16   adequately explained for the jury through numerous relevant jury instructions.  The additional

17   testimony proposed by petitioner would have been cumulative in some respects and irrelevant in

18

19           [3]  In the past, the Ninth Circuit applied a "balancing test" to assess the constitutionality of
     a trial court's discretionary decision to exclude evidence.  *See Miller v. Stagner*, 757 F.2d 988,
20   994–95 (9th Cir. 1985).  However, in *Moses*, the Ninth Circuit concluded that the *Miller*
     balancing test "is a creation of circuit law," rather than clearly established Supreme Court
21   precedent, for purposes of Section 2254(d)(1).  555 F.3d at 759–60.  Therefore, the *Miller* test
     should not be used in federal habeas review of a challenge to a state court's exercise of
22   discretion to exclude expert testimony pursuant to a state evidentiary rule affording such
     discretion.  *Id.*
23
             [4]  To the extent petitioner is claiming that the trial court violated California law when it
24   erroneously excluded the testimony of Dr. Scharff, he is not entitled to federal habeas relief.  *See
     Estelle*, 502 U.S. at 67-68 (federal habeas relief not available for errors in interpretation or
25   application of state law); *Jammal*, 926 F.2d at 919-20 (petitioner may not challenge evidentiary
     ruling on ground that it violated state's evidence code; failure to comply with state rules of
26   evidence does not warrant federal habeas relief).

                                                          17

1   others, as explained by the state appellate court.  As such, the testimony was not necessary or

2   appropriate to explain petitioner's defense theory.  Further, because several portions of Dr.

3   Scharf's proposed testimony were not relevant to the issues at petitioner's trial, they could have

4   actually confused the jury as to the standards to apply in evaluating petitioner's defense.  Under

5   the circumstances of this case, where the proposed testimony was somewhat cumulative and

6   partially irrelevant, there is no reasonable probability its admission into evidence would have

7   resulted in a different outcome at trial.

8        Petitioner also argues that the exclusion of Dr. Scharf's testimony violated his right to

9   due process because of "the enormous disparity under California law between the right of

10  prosecutors to use expert testimony to fill in the gaps in their cases and to make juries aware of

11  facts bearing on the credibility of trial witnesses and the paucity of such rights when sought to be

12  invoked by defense counsel."  Dckt. No. 1 at 24.  Petitioner claims that this disparity "tilts the

13  scales of justice."  *Id.*  Although petitioner gives a "few examples of the common use of experts

14  by prosecutors," in cases involving gangs and child molestation, petitioner does not specify the

15  California laws to which he refers or explain how these laws "tilt the scales of justice" to the

16  prosecution.  Because this claim is vague and conclusory, it must be denied.  *See Jones v.*

17  *Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by

18  a statement of specific facts do not warrant habeas relief'") (quoting *James v. Borg*, 24 F.3d 20,

19  26 (9th Cir. 1994)).

20       The trial court's evidentiary ruling excluding the testimony of Dr. Scharf did not deprive

21  petitioner of his right to present a defense and did not violate due process by rendering his trial

22  fundamentally unfair.  Accordingly, petitioner is not entitled to relief on his first two claims.

23                    **b.  Exclusion of Expert Testimony from David Miller**

24       In petitioner's next ground for relief, he claims that the trial court erred when it excluded

25  the testimony of law school professor David Miller on the subject of "aspects of police activity

26  as it relates to the element 'lawfully engaged in the performance of duties.'"  Dckt. No. 1 at 37.

                                              18

1   Petitioner argues that Miller's testimony was relevant to the issue of whether the vehicle stop in

2   this case was lawful.  *Id.*  The California Court of Appeal denied this claim, reasoning as

3   follows:

4               In an offer of proof, defendant indicated Professor Miller would
               offer opinions as to whether Hogge and Bean were lawfully
5               engaged in the performance of their duties; the application of the
               Fourth Amendment to vehicle stops; and whether the vehicle stop
6               in this case was legal.  In a report prepared for the defense,
               Professor Miller found there was no objective basis to stop
7               defendant based on the suspicion the car was stolen.  The other
               justification offered was that the car had a cracked windshield.
8               Professor Miller conceded this basis presented factual questions
               for the jury, but noted that Hogge did not mention the requirement
9               that the crack impair the driver's vision in his statement and did
               not ask defendant about the windshield during the stop.
10
               Defense counsel argued this testimony "is really the cornerstone of
11              the defense in this case."  He analogized it to a prosecution expert
               testifying that drugs are possessed for sale.
12
               The trial court rejected the defense analogy and found the evidence
13              "inappropriate."  The court reasoned it was the court, not Professor
               Miller, who decides what the law is and there should be no
14              misunderstanding as to whether the jury should follow Professor
               Miller's testimony or the legal instructions given by the court.  The
15              question of whether the officers acted reasonably was a jury
               question to be decided based on the law given to them; it did not
16              require unique expertise.

17              The analysis set forth above concluding the trial court properly
               exercised its discretion in excluding Dr. Scharf's testimony applies
18              with even more force to the court's ruling on Professor Miller's
               testimony.  The jury was fully instructed on the legal requirements
19              for a detention, including the requirements for a stop based on a
               cracked windshield.  As Professor Miller recognized, the legality
20              of the stop for a cracked windshield was essentially a factual
               question for the jury.  The trial court did not err in retaining control
21              of the law presented to the jury and excluding Professor Miller's
               testimony.
22

23   Dckt. No. 18 at 117-18.

24          This claim should be denied for the same reasons set forth in the court's analysis of

25   petitioner's first two claims, set forth above.  The decision of the state courts rejecting this claim

26   is not contrary to or an unreasonable determination of United States Supreme Court authority

19

1   because the Supreme Court has not "squarely addressed" whether a state court's exercise of

2   discretion to exclude expert testimony violates a criminal defendant's right to present relevant

3   evidence.  *See Moses*, 555 F.3d at 760.  Further, in light of the jury instructions given at

4   petitioner's trial and the opportunity for the defense to cross-examine petitioner and Officer

5   Hogge about the vehicle stop, the trial court's ruling excluding the testimony of Dr. Miller did

6   not render petitioner's trial fundamentally unfair.  *See*, *e.g.*, Clerk's Transcript on Appeal (CT)

7   2236-45 (jury instructions given regarding the definition of "performance of official duties," a

8   list of relevant traffic code violations, and the prosecutor's burden of proving beyond a

9   reasonable doubt that the police were engaged in the performance of their duties).  Any claim

10  that the trial court violated California law when it erroneously excluded the testimony of

11  Professor Miller does not warrant federal habeas relief.  *See Estelle*, 502 U.S. at 67-68.

12      For these reasons, petitioner's third claim for relief must be denied.

13          **2.  Jury Instruction Error**

14      Petitioner raises several claims involving jury instruction error.  After setting forth the

15  applicable legal principles, the court will evaluate these claims in turn below.

16          **a.  Relevant Legal Standards**

17      In general, a challenge to jury instructions does not state a federal constitutional claim.

18  *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

19  1983).  To warrant federal habeas relief, a challenged jury instruction "cannot be merely

20  'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

21  right guaranteed by the fourteenth amendment."  *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

22  To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so

23  infected the entire trial that the resulting conviction violates due process.'"  *Prantil v. State of

24  Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir.

25  1987)).  In making its determination, this court must evaluate the challenged jury instructions

26  "'in the context of the overall charge to the jury as a component of the entire trial process.'"  *Id.*

20

1   (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Further, in reviewing an

2   allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable

3   likelihood that the jury has applied the challenged instruction in a way' that violates the

4   Constitution."  *Estelle*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

5   Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is

6   "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be

7   prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See*

8   *also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (same).  In order to prevail on a

9   federal habeas claim, the petitioner must demonstrate that the jury instruction error had

10  "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S.

11  at 637-38.

## b.  Instruction on "Performance of Duties" Principles

13          Petitioner's fourth ground for relief claims that the jury instructions given on the subject

14  of "performance of official duties" were insufficient to "convey the legal requirements of a legal

15  stop."  Dckt. No. 1 at 45, 46.  He argues that the trial court should have given *sua sponte*

16  additional jury instructions to the effect that a traffic stop may not be prolonged beyond the time

17  period necessary to address the traffic violation, and that a decision to stop an automobile is not

18  reasonable if it was based on inappropriate criteria, such as the race of the driver.  *Id.* at 46-67.

19          Petitioner contends that the stop of his vehicle was extended beyond the period of time

20  necessary to address the traffic violation (a cracked windshield), and that Officer Hogge was

21  therefore acting outside the scope of his lawful duties when he pulled petitioner over.  Petitioner

22  also argues that Officer Hogge stopped his vehicle because he was "a Black male driving a better

23  than average automobile, which amounted to racial profiling."  *Id.* at 53.  Petitioner claims that

24  the instructions given to the jury lowered the prosecution's burden of proof, in violation of his

25  right to due process, because they "eliminated significant portions of the legal parameters of

26  lawful police conduct, and the special finding allegation of a murder committed while an officer

21

1    was engaged in the lawful performance of his duty." *Id.* at 56.  Petitioner contends that the

2    illegality of the traffic stop would "impact [his] right to leave the scene, as well as his perception

3    of his right to use self-defense once Officer Hogge began firing at him." *Id.*  He explains that the

4    information contained in his proposed, but rejected, jury instructions was "the foundation of [his]

5    defense that police had no basis to stop him, and that their conduct from the outset of their

6    encounter was outside of lawful police conduct." *Id.* at 58.  Finally, petitioner argues that his

7    trial counsel's failure to request these instructions constitutes ineffective assistance of counsel.

8    *Id.* at 57-58.

9         The California Court of Appeal rejected these arguments, reasoning as follows:

10                   **a.  Instruction on "Performance of Duties" Principles**

11              Defendant contends that under the facts of this case, in light of the
                defense and the issues presented by disputed evidence, the
12              instructions on performance of duties principles were insufficient.
                Specifically, he contends the CALJIC No. 8.81.8 instruction was
13              deficient in two areas.[5]  It did not inform the jury that a traffic stop

14    _____

15         [5]  The trial court instructed the jury as follows:

16    "The phrase 'in the performance of his duties,' as used in these instructions
      means:  [¶]  Any lawful act or conduct while engaged in the maintenance of the
17    peace and security of the community or in the investigation or prevention of
      crime;  [¶] . . . [¶]  Lawfully detaining or attempting to detain a person for
18    questioning or investigation;  [¶]  Using reasonable force to effect a lawful arrest
      or detention.  [¶]  A lawful arrest may be made by a peace officer without a
19    warrant of arrest whenever the officer has reasonable cause to believe that the
      person arrested has committed an infraction or a misdemeanor in the officer's
20    presence.  [¶]  The term 'reasonable cause' as used in this instruction means such
      a state of facts or circumstances confronting the officer at the time of the arrest as
21    would lead an officer of ordinary caution or prudence to believe and
      consciously entertain a strong suspicion that the person arrested had
22    committed an infraction or misdemeanor.  [¶] . . . [¶]  The decision to stop an
      automobile is reasonable and within the performance of a peace officer's duty if
23    the peace officer has reasonable cause or probable cause to believe that a Vehicle
      Code violation has occurred.  [¶]  Reasonable or probable cause to stop an
24    automobile means such a state of fact or circumstances observed by the peace
      officer as would lead a peace officer of ordinary caution or prudence in the same
25    circumstances to believe and consciously entertain a strong suspicion that the
      driver of the automobile committed a Vehicle Code violation.  [¶]  A peace officer
26    may lawfully detain and question a person when the circumstances are such as

may not be prolonged beyond the time necessary to address the violation.  Second, it failed to state that all discretionary law enforcement decisions may be challenged as based on invalid criteria, such as race.

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.]  Included within this duty is the '. . . obligation to instruct on defenses, . . . and on the relationship of these defenses to the elements of the charged offense . . .' where '. . . it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense . . . .' [Citation.]"  (*People v. Stewart* (1976) 16 Cal.3d 133, 140.)

During a traffic stop, a peace officer may detain a motorist "for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop."  (*People v. McGaughran* (1979) 25 Cal.3d 577, 584.)  The officer may examine the motorist's driver's license and registration, carry out any appropriate equipment inspection and tests, and satisfy himself that the motorist fully understands the conduct to be avoided. (*Ibid.*)  The detention may not be longer than necessary to carry out these duties.  (*Id.* at p. 586.)

While it is true the court did not instruct the jury on the law pertaining to prolonged detentions, such an instruction was

---

would indicate to a reasonable peace officer in a like position that such a course of action is within the proper discharge of his duties.  [¶]  Temporary detention for questioning permits reasonable investigation without the necessity of making an arrest.  Although peace officers have the power to detain and question, there must be reasonable cause to detain.  [¶]  Probable or reasonable cause to detain requires that there be some unusual or suspicious circumstance or other demonstrable reason warranting the investigation.  Time, location, number of people, demeanor, conduct of a suspect, a recently reported crime, and the gravity of the crime are among the factors that you may consider.  [¶]  In order for a peace officer to have reasonable cause to detain:  [¶]  1.  There must be a reasonable suspicion by the peace officer that some activity out of the ordinary has taken place or is occurring or is about to occur;  [¶]  2.  Some indication must exist to connect the person under suspicion with that unusual activity; and  [¶]  3. There must be some suggestion that the activity is related to a crime.  [¶]  Regardless of whether a peace officer subjectively believes that the driver of an automobile may be engaging in some other illegal behavior, a traffic stop is permissible and a peace officer is acting within the performance of his duties as long as a reasonable officer in the same circumstances would have reasonable or probable cause to stop the car for a suspected Vehicle Code violation."

23

unnecessary in this case.  At the initial traffic stop, defendant was detained while Hogge asked him whose car it was, his name, and for identification.  When Hogge asked him to step outside the car, defendant took off.  Since Hogge had not completed the routine steps for a traffic stop, the detention was not prolonged.  Defendant makes much of the fact that Hogge did not immediately mention the cracked windshield.  Defendant cites no authority to support the proposition that a detention is prolonged if a peace officer fails to address the Vehicle Code violation before he ascertains the identity of the motorist and has assured officer safety.  We are aware of no such requirement.  There was no error in failing to instruct on a prolonged traffic detention; the evidence did not warrant such an instruction.

It was the defense position at trial that the initial stop was due to racial profiling; the officers became suspicious because a Black male in a beanie was driving a better than average car.  Hogge testified that although the car was not reported as stolen, he was suspicious and then looked for equipment violations.  Defendant argues the trial court should have instructed that it is constitutionally impermissible to stop a car based on an inappropriate criteria such as race.

Defendant relies on Justice Brown's dissent in *People v. McKay* (2002) 27 Cal.4th 601, 628-642, for support.  Justice Brown recognized the practice of traffic stops based on race.  "The practice is so prevalent, it has a name: 'Driving while Black.'"  (*Id.* at p. 640.)  She argued such stops were inherently unreasonable under the Fourth Amendment.  (*Id.* at p. 640, fn. 6.)

In *Whren v. United States* (1996) 517 U.S. 806 [135 L.Ed.2d 89], the United States Supreme Court, in a unanimous opinion, made clear that the actual motivations of the individual officers in a traffic stop are irrelevant to the constitutional reasonableness of the stop.  The petitioners, who were both Black, argued that because traffic violations could be used as a pretext for a stop actually based on impermissible factors, such as race, the standard ought to be whether a reasonable officer would have made the stop for the reason given.  (*Id.* at p. 810 [135 L.Ed.2d at p. 96].)  The high court rejected this argument; if the officers have probable cause to believe there is a violation of the traffic code, the stop is reasonable.  (*Id.* at p. 819 [135 L.Ed.2d at p. 101].)

The court addressed petitioners' concern about racially motivated traffic stops.  "We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on consideration such as race.  But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.  Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  (*Whren v. United States, supra*, at p. 813

1         [135 L.Ed .2d at p. 98].)

2         The trial court's instruction was consistent with the United States
        Supreme Court's decision in *Whren*.  The court instructed the jury:
3         "a traffic stop is permissible and a peace officer is acting within
        the performance of his duties as long as a reasonable officer in the
4         same circumstances would have reasonable or probable cause to
        stop the car for a suspected Vehicle Code violation."  There was no
5         error in instructing in the language of CALJIC No. 8.81.8.

6 Dckt. No. 18 at 119-123.

7         A criminal defendant is entitled to adequate instructions on a defense theory of the case

8 provided that the defense theory is supported by law and has some foundation in the evidence.

9 *United States v. Thomas*, 612 F.3d 1107, 1120 (9th Cir. 2010).  *See also United States v. Escobar*

10 *de Bright*, 742 F.2d 1196, 1198 (9th Cir. 1984) ("The general principle is well established that a

11 criminal defendant is entitled to have a jury instruction on any defense which provides a legal

12 defense to the charge against him and which has some foundation in the evidence, even though

13 the evidence may be weak, insufficient, inconsistent, or of doubtful credibility") (quoting *United*

14 *States ex rel. Peery v. Sielaff*, 615 F.2d 402, 403 (7th Cir. 1979)).  A criminal defendant also has

15 the right to have a jury resolve disputed factual issues.  *United States v. Dorrell*, 758 F.2d 427,

16 430 n.2 (9th Cir. 1985).  However, where the evidence, even if believed, does not establish all of

17 the elements of a defense, the trial judge need not submit the defense to the jury.  *Id.* at 430.[6]  A

18 failure to give an appropriate instruction is reversible error.  *United States v. Mason*, 902 F.2d

19 1434, 1438 (9th Cir. 1990).  However, "it is not reversible error to reject a defendant's proposed

20 instruction on his theory of the case if other instructions, in their entirety, adequately cover that

21 defense theory."  *Id.*

22

23       [6] In California, the trial court has a sua sponte obligation to give instructions on a
defense when (1) defendant is relying on the defense or (2) there is substantial evidence
24 supportive of the defense and when the defense is not inconsistent with the defendant's theory of
the case.  *People v. Barton*, 12 Cal.4th 186 (1995).  To warrant a defense instruction, "the
25 accused must present 'evidence sufficient to deserve consideration by the jury, i.e., evidence
from which a jury composed of reasonable men could have concluded that the particular facts
26 underlying the instruction did exist.'"  *People v. Strozier*, 20 Cal.App.4th 55, 63 (1993).

1    The California Court of Appeal concluded that the facts of this case did not support the

2  first jury instruction requested by petitioner, to the effect that an officer is not acting within the

3  performance of his duties if he unduly prolongs a traffic stop.  This conclusion is not

4  unreasonable.  The record does not support petitioner's theory that the detention in this case was

5  prolonged longer than necessary to address the traffic violation which prompted the stop.  As

6  noted by the state appellate court, petitioner "took off" before Officer Hogge could even

7  complete his initial questioning.  In short, a jury instruction to the effect that a traffic stop may

8  not be prolonged beyond the time period necessary to address the traffic violation was not

9  supported by the evidence in this case and need not have been given by the trial court.

10    Nor was the state court unreasonable in concluding that due process did not require a jury

11  instruction on racial profiling.  As explained by the California Court of Appeal, the United States

12  Supreme Court has held that an officer's subjective reason for a traffic stop is irrelevant to a

13  Fourth Amendment analysis so long as a reasonable person would have reasonable cause to stop

14  a vehicle for a traffic violation.  There is no dispute that petitioner's vehicle had a cracked

15  windshield and that this traffic violation was, at least in part, one of the reasons Officer Hogge

16  pulled petitioner over.  Under these circumstances, the trial court was not required to inform the

17  jury that petitioner may have been stopped for other, improper reasons, such as his race.  Further,

18  the jury instructions given at petitioner's trial adequately and accurately informed the jury of the

19  state of the law on this issue.  *See* Reporter's Transcript on Appeal (RT) at 5773-76.

20    The jury was aware of petitioner's argument that the initial traffic stop in this case was

21  unlawful.  The jury instructions explained the defense theory of the case, informing the jury that

22  "it is no crime to nonviolently resist the unlawful action of a police officer," and that "if a person

23  flees in direct response to an unlawful police action, a peace officer does not engage in lawful

24  police action in subsequently detain[ing] or arresting the person merely because the person has

25  taken flight from the initial unlawful police action."  *Id.* at 5776.  The failure to give additional

26  jury instructions which had no basis in the facts and/or the law did not violate petitioner's right

26

to due process.

Finally, because petitioner did not suffer prejudice from the trial court's failure to give the two requested jury instructions on performance of official police duties, petitioner's trial counsel did not render ineffective assistance in failing to request these instructions. *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984).

### c.  Modification to CALJIC No. 9.27

In petitioner's next ground for relief, he claims that the trial court violated his right to due process when it denied his request to give a modified version of CALJIC No. 9.27.[7]  Dckt. No. 1

---

[7]  CALJIC No. 9.27 provides:

> A peace officer may lawfully detain and question a person when the circumstances are such as would indicate to a reasonable peace officer in a like position that such a course of conduct is necessary to the proper discharge of [his] [her] duties.

> Temporary detention for questioning permits reasonable investigation, without the necessity of making an arrest.  Although peace officers have the power to detain and question, there must be probable or reasonable cause to detain.  Probable or reasonable cause to detain requires that there be some unusual or suspicious circumstance, or other demonstrable reason, warranting the investigation.  Time, location, number of people, demeanor and conduct of a suspect, a recently reported crime, and the gravity of the crime, are among the factors that you may consider.

> The general grounds for a reasonable detention are:

> 1 There must be a rational suspicion by the peace officer that some activity out of the ordinary has taken place, is occurring or is about to occur;

> 2 Some indication must exist to connect the person under suspicion with the unusual activity; and

> 3 There must be some suggestion that the activity is related to a crime.

Petitioner's jury received this instruction.  RT at 5775-76.  They were also instructed that, pursuant to the California Vehicle Code, "it is unlawful to operate any motor vehicle upon a highway when the windshield or rear window is in such a defective condition as to impair the driver's vision either to the front or the rear."  *Id.* at 5778.

at 59.  He argues that his proposed modified instruction "accurately reflects the law, and

appropriately pinpoints the defense theory of the case." *Id.* at 60.

The California Court of Appeal denied this claim, reasoning as follows:

### b.  Instruction on Modification to CALJIC 9.27

Defendant contends the trial court erred in rejecting his proposed modification to CALJIC No. 9.27.  He asserts the modification was proper because it was an accurate statement of the law and pinpointed the defense.  He contends the error was prejudicial because the other instructions did not sufficiently cover the issue.

Defendant proposed modifying CALJIC No. 9.27 by the addition of the following two paragraphs:  "A police officer may not stop a motor vehicle based on a suspicion or hunch that the vehicle was stolen.  If you believe that Officer Hogge and Officer Bean stopped the vehicle driven by the defendant based on a hunch or suspicion that the vehicle was stolen then you may find that said Officers were not acting within the lawful performance of their duties.  [¶]  Vehicle Code section 26710 states that it is unlawful to operate any motor vehicle upon a highway when the windshield is in such defective condition as to impair the driver's vision either to the front or the rear.  However, there is no law against having a cracked windshield.  Operation of a vehicle with a cracked windshield is unlawful in California only if the crack 'impairs the driver's vision.'  Therefore in order to justify the stop of the vehicle driven by the defendant either Officer must have seen something that reasonably appeared to be a crack in the windshield and must have determined that the crack reasonably appeared to be one that would impair the driver's vision.  If you believe that the Officer did not 1) see the crack and 2) determined [sic] that the crack impaired the driver's vision – then you must conclude that the Officers were not acting in the lawful performance of their duties."

The prosecution objected to the modification because the defense was attempting to make the initial stop the decisive moment for determining the validity of the officers' conduct.  The prosecution theory was that even if the jury found the initial stop unlawful, defendant's subsequent unlawful acts (exhibition of speed, running a stop sign, fleeing from officers) allowed the officers to detain or arrest him.

The trial court rejected the modification. It found the instruction argumentative and the first part was wrong as a matter of law.  If the officer had a reasonable, objective basis to stop the car, it did not matter that he had an ulterior motive under *Whren v. United States, supra*, 517 U.S. 806 [135 L.Ed.2d 89].

28

1        The trial court instructed the jury on stopping a car for a cracked
2    windshield as follows: "Vehicle Code 26710.  It is unlawful to
    operate any motor vehicle upon a highway when the windshield or
    rear window is in such a defective condition as to impair the
3    driver's vision either to the front or the rear."

4        A defendant is entitled to an instruction that pinpoints the theory of
    the defense.  (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.)  The
5    trial court, however, must determine that the proffered instruction
    is an accurate statement of the law.  (*See People v. Thompkins*
6    (1987) 195 Cal.App.3d 244, 257.)

7        The trial court did not err in rejecting the proposed modification;
    the first paragraph was an inaccurate statement of the law.  As
8    discussed above, under *Whren v. United States, supra*, 517 U.S.
    806 [135 L.Ed.2d 89], the officer's subjective intent for making a
9    traffic stop is irrelevant for Fourth Amendment purposes; the stop
    is reasonable if there is probable cause to believe the traffic law
10   has been violated.  The instruction was inaccurate because it
    suggested the stop was unlawful if based on a hunch, regardless of
11   whether there was a reasonable cause for the stop.

12       Defendant contends the modification was not argumentative
    because it did not "improperly imply the conclusion to be drawn
13   from that evidence."  (*People v. Harris* (1989) 47 Cal.3d 1047,
    1098, fn. 31.)  At the very least, the second paragraph of the
14   modification was repetitive and artless.   The court instructed on
    the law as to driving with a cracked windshield, including the
15   requirement that the defect impair the driver's vision.  Defendant
    has not shown how the instruction given was inadequate.

16
17       The trial court did not err in rejecting defendant's proposed
    modification to CALJIC No. 9.27.

18   Dckt. No. 18 at 123-26.

19       As set forth above, a defendant is entitled to jury instructions that present the crux of his

20   defense.  *See Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002).  In addition, a trial

21   judge must properly instruct the jury regarding the law and all of the elements of the crime.  *See*

22   *Hennessy v. Goldsmith*, 929 F.2d 511, 514 (9th Cir. 1991).  However, there is no entitlement to

23   tailor-made instructions that pinpoint certain aspects of the defense.  "'So long as the instructions

24   fairly and adequately cover the issues presented, the judge's formulation of those instructions or

25   choice of language is a matter of discretion.'"  *United States v. Hernandez-Escarsega*, 886 F.2d

26   1560, 1570 (9th Cir. 1989) (quoting *United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir.

1  1985)); see also *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *Duckett v.*

2  *Godinez*, 67 F.3d 734, 743 (9th Cir. 1995) ("it is *not* reversible error to reject a defendant's

3  proposed instruction on his theory of the case if other instructions, in their entirety, adequately

4  cover the defense theory") (emphasis in original.)  The decision whether to give special jury

5  instructions lies within the discretion of the judge, so long as the instructions given encompass

6  the defense theory.  *See United States v. Hurd*, 642 F.2d 1179, 1181-82 (9th Cir.1981).

7       Assuming arguendo that petitioner's proposed instructions were an accurate statement of

8  California law, so too were the instructions given by the trial court.  As summarized by

9  respondent, petitioner's theory of defense was that "Officer Hogge was out of control and made

10  the initial stop without reasonable suspicion," and that Hogge "unnecessarily fired first and used

11  excessive and unlawful force against Petitioner."  Dckt. No. 18 at 51.  Petitioner's jurors were

12  accurately and fully instructed on the issues relating to this defense.  For instance, they were

13  instructed that the prosecution had the burden of proving beyond a reasonable doubt that Officers

14  Hogge and Bean were engaged in the performance of their duties, and that the "performance of

15  their duties" required lawful conduct.  RT at 5773, 5778.  They were also instructed on the

16  applicable law regarding lawful detention and on applicable violations of the vehicle code.  *Id.* at

17  5775-76, 5777-8.  They were instructed that the California Vehicle Code made it unlawful to

18  drive a vehicle with a cracked windshield only if the windshield impaired the driver's vision.

19  Finally, the jurors were instructed that: (1) "if a person flees in direct response to an unlawful

20  police action, a peace officer does not engage in lawful police action in subsequently detain[ing]

21  or arresting the person merely because the person has taken flight from the initial unlawful

22  police action" (*id.* at 5776); (2) "a peace officer is not engaged in the performance of his duties if

23  he makes or attempts to make an unlawful arrest or detention or uses unreasonable or excessive

24  force in making or attempting to make the arrest or detention" (*id.* at 5778); and (3) "if you have

25  a reasonable doubt that officer Hogge was acting in an unlawful manner or was using

26  unreasonable force in the performance of his duties, then you must find that Officer Bean and

30

1   Officer Hogge were acting unlawfully in the performance of their duties at that time." *Id.* These

2   instructions fully encompassed and explained petitioner's defense theory and the law regarding

3   lawful vehicle stops.  The trial court's decision not to give additional instructions that were

4   either legally incorrect, argumentative, or cumulative did not render petitioner's trial

5   fundamentally unfair.  The trial court's refusal to give petitioner's proposed modification to

6   CALJIC No. 9.27 was not contrary to, or an unreasonable application of, clearly established

7   federal law.  Accordingly, petitioner is not entitled to relief on this claim.

8                          **d. Instructions on Duress and Necessity**

9          Petitioner's next claim is that the trial court violated his right to due process when it

10  refused to instruct the jury on the defenses of duress and necessity.  Dckt. No. 1 at 65-69.  He

11  argues that these instructions "pertained to the jury's ability to find implied malice as to the

12  second degree murder conviction," and were "important to the consideration of [petitioner's]

13  right to depart from his detention after the first stop, since the prosecution relied heavily on the

14  premise that the commission of other alleged misdemeanors upon his departure, such as fleeing a

15  pursuing police office, failure to obey a signal and exhibition of speed, gave police yet another

16  lawful right to stop [petitioner]." *Id.* at 65.  Petitioner argues that if the jury believed he was

17  leaving the scene because Officer Bean told him to leave, or because he was afraid that Officer

18  Hogge was going to shoot him, the officers would not have had legal grounds to pursue him.  *Id.*

19  He also argues that jury instructions on duress and necessity were particularly necessary in light

20  of the following jury instruction which was given by the trial court:

21              It is no crime to nonviolently resist the unlawful action of a police
                officer.  Therefore, if a person flees in direct response to an
22              unlawful police action, a peace officer does not engage in lawful
                police action in subsequently detain[ing] or arresting the person
23              merely because the person has taken flight from the initial
                unlawful police action.
24
                However, if during the flight from the unlawful police action, the
25              officer observes that person committing a new and distinct crime,
                the officer does engage in lawful conduct in subsequently
26              detaining or arresting the person for that new and distinct crime.

                                              31

1

2       The subsequent detaining or arresting the person for the observed
   new and distinct crime is lawful, even if the new and distinct crime
3   is in response to the initial unlawful police action.

4   RT at 5776-77.  Petitioner argues that the instruction set forth above improperly allowed the

5   jurors to find that, even if he lawfully left the scene because of threats from Officer Hogge, he

6   was later properly subject to detention "because of traffic violations committed while reacting to

7   factors suggesting duress."  Dckt. No. 1at 68.  Petitioner contends that an instruction on duress

8   was "necessary to understand the issue of resistance to unlawful police action, and whether

9   police were acting lawfully when pursuing appellant, which is the very event that gave rise to the

10  purported basis to stop him a second time."  *Id.*  He argues that an instruction on necessity was

11  also "applicable to the issue of implied malice, as well as the legality of police conduct."  *Id.*

12      The California Court of Appeal rejected these arguments, reasoning as follows:

13      **c.  Instructions on Duress and Necessity**

14      Defendant contends the trial court erred in rejecting his request for
   instructions on duress and necessity.  He contends these
15  instructions were supported by the evidence and relevant to
   implied malice, his right to leave after the initial stop, and whether
16  the officers were engaged in lawful performance of their duties.
   He contends the error requires reversal.
17
       Defendant requested that the trial court instruct on CALJIC 4.40
18  (duress) and CALJIC No. 4.43 (necessity).[8]  The court refused the

19  _____

20      [8]  The requested instructions were:  "A person is not guilty of a crime [other than
   _____] when [he][she] engages in conduct, otherwise criminal, when acting under threats and
21  menaces under the following circumstances:  [¶] 1.  Where the threats and menaces are such that
   they would cause a reasonable person to fear that [his][her] life would be in immediate danger if
22  [he][she] did not engage in the conduct charged, and [¶] 2.  If this person then actually believed
   that [his][her] life was so endangered.  [¶]  This rule does not apply to threats, menaces, and fear
23  of future danger to [his][her] life[,] [nor does it apply to the crime[s] of (crime punishable by
   death) ]."  (CALJIC No. 4.40)
24
   "A person is not guilty of a crime when [he][she] engages in an act, otherwise criminal, through
25  necessity.  The defendant has the burden of proving by a preponderance of the evidence all of the
   facts necessary to establish the elements of this defense, namely:  [¶] 1.  The act charged as
26  criminal was done to prevent a significant and imminent evil, namely, [a threat of bodily harm to

instructions, finding them "inappropriate" in a murder case.

Defendant contends the instructions were relevant to the issue of implied malice.  He recognizes that duress is not a defense to any form of murder.  (*People v. Anderson* (2002) 28 Cal.4th 767, 780.)  Duress does not reduce murder to manslaughter; that is a policy decision for the Legislature.  (*Id.* at pp. 782-784.)  Nor is necessity a defense to murder.  (*See People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100-101 ["'[i]t is not acceptable for a defendant to decide that it is necessary to kill an innocent person in order that he [or she] may live'"].)

Nonetheless, defendant seizes upon language in *Anderson* to support his argument.  "Although duress is not an affirmative defense to murder, the circumstances of duress would certainly be relevant to whether the evidence establishes the elements of implied malice murder.  The reasons a person acted in a certain way, including threats of death, are highly relevant to whether the person acted with a conscious or wanton disregard for human life.  [Citation.]  This is not due to a special doctrine of duress but to the requirements of implied malice murder."  (*People v. Anderson, supra*, 28 Cal.4th at pp. 779-780.)

Defendant contends his testimony that at the first stop Bean told him to leave while Hogge threatened to kill him, supports instructions on duress and necessity to evaluate implied malice.  We disagree.  The act that would show implied malice was defendant shooting at the officers.  There is no evidence to support a theory that defendant's shooting was the result of duress or necessity.  The language in *Anderson* was in response to a hypothetical of an innocent person forced at gunpoint by fleeing armed robbers to drive recklessly, and who is charged with murder when a fatal accident occurs.  (*People v. Anderson, supra*, 28 Cal.4th at p. 779.)  There is nothing similar here.  Even if the jury accepted that defendant was forced to flee recklessly after the initial stop, the law did not excuse his shooting based on duress or necessity.

Defendant also contends duress and necessity are relevant in evaluating his right to leave after the initial stop and thus whether the officers were lawfully engaged in the performance of their duties when they continued to pursue him.  Defendant suggests

---

oneself or another person] [or] [_____];  [¶]  2.  There was no reasonable legal alternative to the commission of the act;  [¶]  3.  The reasonably foreseeable harm likely to be caused by the act was not disproportionate to the harm avoided;  [¶]  4.  The defendant entertained a good-faith belief that [his][her] act was necessary to prevent the greater harm;  [¶]  5.  That belief was objectively reasonable under all the circumstances; and  [¶]  6.  The defendant did not substantially contribute to the creation of the emergency."  (CALJIC No. 4.43.)

duress or necessity were defenses to the subsequent Vehicle Code violations – fleeing the police, exhibition of speed, and failing to stop at a stop sign – which the prosecution argued validated the second stop, even if the jury found the first stop unlawful. This convoluted argument fails. Under defendant's version of events, he left after the initial stop in a lawful manner. Defendant testified he did not break traction when he left. He was purposefully driving slowly, thinking the patrol car was responding to an emergency, and then voluntarily stopped and approached the officers. Under Hogge's version, there is no evidence that defendant was forced to run a stop sign by duress or necessity. Hogge testified defendant coasted through the stop sign after his car stalled.

Furthermore, the requested instructions would have been confusing as they stated duress and necessity were defenses to crimes and the only crime defendant was charged with was murder to which neither duress nor necessity is a defense. It is not error to refuse confusing or incomplete instructions. (*See People v. Diedrich* (1982) 31 Cal.3d 263, 286; *People v. Campanella* (1941) 46 Cal.App.2d 697, 703.)

The trial court did not err in refusing instructions on duress and necessity.

Dckt. No. 18 at 126-29.

The decision of the California Court of Appeal rejecting this jury instruction claim is not contrary to or an unreasonable application of United States Supreme Court authority and should not be set aside. Under the circumstances of this case, the trial court's decision not to give jury instructions on duress and necessity did not render petitioner's trial fundamentally unfair. As explained above in connection with petitioner's other claims, the jury instructions as a whole fully explained petitioner's theory of defense, including his theory that his actions were not unlawful because they were in response to improper police actions. Petitioner testified as to the reasons he fled the police after the first stop. Further, petitioner's proposed instructions on duress and necessity were confusing; not applicable to the crimes with which petitioner was charged, either legally or factually; and, in part, contrary to California law. Under these circumstances, petitioner has not met his "heavy burden" of demonstrating that his due process rights were violated by the trial court's failure to give jury instructions on duress and necessity.

34

1    Accordingly, petitioner is not entitled to relief on this claim.

2                                 **e.  Instruction on Flight**

3           In his next ground for relief, petitioner claims that the trial court violated his right to due

4    process when it gave an instruction on flight after unlawful police action.  Dckt. No. 1 at 70-72.

5    He appears to be claiming that the instruction incorrectly stated the law and was inconsistent

6    with his contention that he fled the police out of necessity and under duress.  *Id.*  He explains:

7                     There is little value to [petitioner] being able to depart away from
                     the officers for what was under his interpretation of the incident,
8                    not only unlawful conduct, but also an indication that one of the
                     officers was discussing shooting him.  Any haste in leaving or
9                    failing to yield to the officer's attempt to pull him over, would, in
                     light of duress and necessity principles . . . impact a determination
10                   of the lawfulness of the officer's subsequent actions.

11   *Id.* at 71.  Petitioner also argues that the trial court failed to explain the "allocation and weight of

12   the burden of proof."  *Id.* at 70.

13          The California Court of Appeal rejected these arguments, reasoning as follows:

14                **d.  Special Instruction on Flight after Unlawful Police Action**

15                   Defendant contends the trial court erred in giving the prosecution's
                     special instruction No. 3 over defense objection.  He contends the
16                   second paragraph of the special instruction incorrectly or
                     incompletely stated the law.

17
                     The trial court gave the prosecution's special instruction No. 3 as
18                   follows:  "It is no crime to nonviolently resist the unlawful action
                     of a police officer.  Therefore, if a person flees in direct response
19                   to an unlawful police action, a peace officer does not engage in
                     lawful action in subsequently detain[ing] or arresting the person
20                   merely because the person has taken flight from the initial
                     unlawful police action.
21
                     "However, if during the flight from the unlawful police action the
22                   officer observes that person committing a new and distinct crime,
                     the officer does engage in lawful police conduct in subsequently
23                   detaining or arresting the person for that new and distinct crime."

24                   Defendant's argument concerning this instruction is a reiteration of
                     his previous contention challenging the refusal to instruct on
25                   duress and necessity.  He contends duress and necessity principles
                     affect the determination of the lawfulness of his flight after the
26                   initial stop.  We construe defendant's argument to be that the

                                                  35

1

2

3

4

5

6

7

8

> special instruction should have included the principles of duress
> and necessity.  Since we have rejected the argument that the court
> had to instruct on these legal principles, we reject this contention
> as well.
>
> Quoting *People v. Mower* (2002) 28 Cal.4th 457, 483-484,
> defendant also asserts the court must correctly instruct on the
> allocation and weight of the burden of proof.  In *Mower*, the
> California Supreme Court held defendant bore the burden of proof
> to assert a medical marijuana defense, but that burden only
> required him to raise a reasonable doubt as to the facts underlying
> the defense.  (*Id.* at p. 481.)  Since we have concluded the trial
> court did not err in refusing to instruct on duress and necessity, it
> was not error to fail to instruct on the allocation of the burden of
> proof for these defenses.

9   Dckt. No. 18 at 129-31.

10        This jury instruction claim appears to be concerned solely with the correct interpretation

11   of state law.  However, whether or not the jury instruction on flight correctly stated California

12   law or was  applicable under California law to the charges against petitioner is not cognizable in

13   this federal habeas petition.  This Court is bound by the state court's interpretation of state law.

14   *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993).  Absent some federal constitutional

15   violation, a violation of state law does not provide a basis for habeas relief.  *Estelle*, 502 U.S. at

16   67-68.  Under the circumstances of this case, petitioner has failed to demonstrate that the giving

17   of the jury instruction on flight rendered his trial so fundamentally unfair that it violated the

18   federal Due Process Clause.

19        Respondent argues that petitioner's claim regarding allocution of the burden of proof is

20   unexhausted, but that it should nevertheless be denied on the merits.  *See* 28 U.S.C. § 2254(b)(2)

21   (an unexhausted claim may be denied on the merits).  This court agrees.  Assuming arguendo

22   that petitioner's claim in this regard was not exhausted in state court, it should be denied.  The

23   jury instructions, as a whole, correctly instructed petitioner's jury on the applicable burden of

24   proof and on petitioner's defense theory.  The trial court's failure to give a jury instruction on the

25   allocation of the burden of proof with respect to the defenses of duress and necessity did not

26   render petitioner's trial fundamentally unfair.  Petitioner has failed to demonstrate that the state

36

1  court's ruling on this claim is contrary to or an unreasonable application of United States

2  Supreme Court authority.  Accordingly, he is not entitled to relief on this claim.

3  **f.  Jury Instruction Regarding Inability to Deliberate**

4  Petitioner claims that the trial court violated his right to due process and to a unanimous

5  jury when it gave a jury instruction based on *People v. Moore*, 96 Cal.App.4th 1105, 1118-20

6  (2002) after the jury informed the judge that it was having trouble reaching a verdict.  Dckt. No.

7  1 at 97-111.  Petitioner refers to this instruction given by the trial court as a "mini-*Allen* charge."

8  *Id.* at 103.  Petitioner is claiming, in essence, that the trial judge gave an improper *Allen* charge

9  to the jurors and that the charge effectively coerced the jury to reach a unanimous verdict against

10  him in violation of his rights to an impartial jury and a fair trial.

11  The California Court of Appeal denied this claim, reasoning as follows:

12  **e.  "Moore" Instruction**

13  Defendant contends the trial court erred and denied him due
process and the right to an unanimous jury when, after three days
14  of jury deliberation, the court instructed the jury pursuant to
*People v. Moore* (2002) 96 Cal.App.4th 1105, 1118-1120.  He
15  contends this "firecracker instruction" violated the principles set
forth in *People v. Gainer* (1977) 19 Cal.3d 835, that there be no
16  coercion of a juror to reach a verdict and the individual
decisionmaking role of each juror not be diminished.

17
On the third day of jury deliberations, the jury foreman sent a note
18  which said: "It is the concences [sic] of the jury that we have one
juror whom we believe is incapable of making a decision one way
19  or the other, and is not able to follow the instructions and law as
directed by the court.  This juror cannot separate evidence in order
20  to come to a conclusion on one simple point.  Please advise us on
how to precede [sic ]."
21
The next day, after consulting with counsel, the trial court called
22  the jury foreman in for questioning.  The foreman indicated the
note had been read aloud before being sent to the judge and 11
23  jurors agreed with it.  The foreman believed one juror had a wrong
interpretation or incorrect analysis of the law and her failure to
24  come to closure was due to a failure of logic and analysis.  It was
the consensus of the other jurors that this juror was very confused
25  and unable to separate individual testimony and physical evidence
in order to reach a conclusion.
26

The trial court suggested giving the instruction set forth in *People v. Moore, supra*, 96 Cal.App.4th 1105.  Defense counsel objected because it singled out one juror.  The trial court decided to give the instruction and rejected the modification proposed by the defense.

The court instructed the jury: "It has been my experience on more than one occasion that a jury which initially reported it was unable to reach a verdict was ultimately able to arrive at a verdict.

"To assist you in your further deliberations the Court is going to further instruct you as follows.

"Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh, and evaluate all the evidence presented at the trial, to discuss your views regarding the evidence and to listen to and consider the views of your fellow jurors.

"In the course of your deliberations you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs.

"You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong.

"Fair and effective jury deliberation requires a frank and forthright exchange of views.

"As the Court previously instructed you, each of you must decide the case for yourself.  And should do so only after a full and complete consideration of all of the evidence with your fellow jurors.

"It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.

"Both the People and the defendant are entitled to the individual judgment of each juror.

"As the Court previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

"The Court suggests that since you have not been able to arrive at a verdict using the methods that you have chosen that you consider

38

changing the method you have been following at least temporarily and try new methods.  For example, you may wish to consider having different jurors leave [sic-lead] the discussion for a period of time, or you may wish to experiment with reverse role playing by having those who on one side of an issue represent or present an[d] argue the other side's position and vice versa.  This might enable you to understand the other's position.

"By suggesting you should consider changes in your methods of deliberation, I want to stress the Court is not dictating or instructing you as to how to conduct your deliberations.

"The Court merely finds that you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"The Court also suggests you reread CALJIC 1.00 on page 1 and 1A; CALJIC instruction 17.40 on page 82 and CALJIC instruction 17.41 on page 83.

"These instructions pertain to duties as your jurors and make recommendations on how you should deliberate.  The integrity of a trial requires the jurors at all times during their deliberations conduct themselves as required by the instructions.

"CALJIC instruction 1.00 defines the duties of a jury.  The decision the jury renders must be based on the facts and the law.

"You must determine what facts have been proved from the evidence received in the trial and not from any other source.

"A fact is something proved by the evidence or by stipulation.

"Second, you must apply the law that I state to you to the facts as you determine them and in this way arrive at your verdict.

"You must accept and follow the law as I state it to you regardless of whether you agree with the law.

"If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

"CALJIC 17.40 defines the jury's duty to deliberate.

"The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court.

////

"These are the matters this instruction [ ] requires you to discuss for the purpose of reaching a verdict.

"CALJIC 17.41 is an instruction which recommends how jurors should approach their task.

"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to you.

"I hope my comments and suggestions may have some assistance to you.

"You are ordered to continue your deliberations at this time.  If you have other questions, concerns, requests or any communications you desire to report to me, please put those in writing on the form my court attendant has provided to you.

"Have them signed and dated by your foreperson and please notify the Court attendant.  A copy of the instructions which I have just read will be made available to you shortly.

"You are to continue your deliberations."

This instruction is almost identical to the one at issue in *People v. Moore, supra*, 96 Cal.App.4th 1105, 1118-1120.  That instruction was challenged as coercive and improper.  (*Id.* at p. 1120.)  This court rejected the contention and commended the trial judge "for fashioning such an excellent instruction."  (*Id.* at p. 1122.)

The *Moore* court noted that in *Allen v. United States* (1896) 164 U.S. 492, 501-502 [41 L.Ed. 528, 531], the Supreme Court approved an instruction which encouraged jurors in the minority to reexamine their views in light of those expressed by the majority, noting that the case must be decided at some time.  (*People v. Moore, supra,* 96 Cal.App.4th at p. 1120.)  The California Supreme Court, however, disapproved an *Allen* charge in *People v. Gainer, supra,* 19 Cal.3d 835.  The *Gainer* court found directing the minority jurors to rethink their position in light of the majority views was improper because it encouraged them to abandon a focus on the evidence as the basis of their verdict.  (*People v. Moore, supra,* at pp. 1120-1121.)  Further, it was inaccurate and improper to direct the jury that the case must be decided at some point because it was possible the case might not be retried.  (*Id.* at p. 1121.)

The *Moore* court found the instruction at issue was not an improper *Allen* charge because the court did not instruct that the case must be decided at some point and nothing was designed to coerce the jury into returning a verdict.  (*People v. Moore, supra,*

96 Cal.App.4th at p. 1121.)  Rather, the instruction told the jurors to consider, weigh and evaluate all the evidence and that their duty was "to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment." (Italics added.)  The *Moore* court found nothing in the instruction that was coercive or an attempt to pressure the jury to reach a verdict.  (*Ibid.*)

We agree with this court's decision in *People v. Moore, supra*, 96 Cal.App.4th 1105, and find nothing improper in the instruction the trial court gave.  Defendant's contentions that the instruction was coercive or directed the jury that it was expected to reach a verdict are answered by the discussion in *Moore*.

Defendant contends it was error to give the instruction because it was not clear the jury was at an impasse.  The court did not determine whether any votes had been taken or question any juror other than the foreman.  Previously, a juror had reported the jury was at a deadlock and needed assistance.  Penal Code section 1140 grants the trial court discretion to determine whether there is a reasonable probability the jurors can agree on a verdict.  (*People v. Moore, supra*, 96 Cal.App.4th at p. 1122.)  That the jury was eventually able to reach a unanimous verdict shows the trial court properly exercised its discretion.

Defendant also complains there was an error in the instruction as read to the jury.  The court suggested "you may wish to consider having different jurors leave the discussion for a period of time." The printed version, which was given to the jury, correctly stated "lead" rather than "leave."  Defendant contends if the jurors followed the oral instruction, there may have been periods when all 12 were not deliberating.

The court had previously instructed the jury that deliberations could occur only when all 12 jurors were together and assembled in the jury room.

"'It is generally presumed that the jury was guided by the written instructions.' [Citations.]  The written version of jury instructions governs any conflict with oral instructions.  [Citations.]  Consequently, as long as the court provides accurate written instructions to the jury to use during deliberations, no prejudicial error occurs from deviations in the oral instructions.  [Citations.]" (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1112-1113.)

Dckt. No. 18 at 139-47.

A trial judge's instruction to a jury to continue deliberations is impermissible only if the

jury was improperly coerced to relinquish their views in favor of reaching a unanimous decision,

1   thus infringing the defendant's right to due process. *Lowenfield v. Phelps*, 484 U.S. 231, 237-41

2   (1988); *Jiminez v. Myers*, 40 F.3d 976, 979-80 (9th Cir. 1993); *Locks v. Sumner*, 703 F.2d 403,

3   406 (9th Cir. 1983).  A reviewing court considers whether the court's actions and statements

4   were coercive in the totality of the circumstances. *Lowenfield*, 484 U.S. at 237; *United States v.*

5   *Seawell*, 550 F.2d 1159, 1163 (9th Cir. 1977) ("the general test of whether a supplemental jury

6   instruction is in error is to consider all the circumstances to determine if the instruction was

7   coercive") (citation omitted).

8          An "*Allen* charge" is

9          the generic name for a class of supplemental jury instructions
           given when jurors are apparently deadlocked; the name derives
10         from the first Supreme Court approval of such an instruction in
           *Allen v. United States*, 164 U.S. 492, 501-02, 17 S.Ct. 154, 41
11         L.Ed. 528 (1896).  In their mildest form, these instructions carry
           reminders of the importance of securing a verdict and ask jurors to
12         reconsider potentially unreasonable positions.  In their stronger
           forms, these charges have been referred to as "dynamite charges,"
13         because of their ability to "blast" a verdict out of a deadlocked
           jury.  The charge has also been called the "third degree
14         instruction," "the shotgun instruction," and "the nitroglycerin
           charge."

15

16  *United States v. Berger*, 473 F.3d 1080, 1089 (9th Cir. 2007) (quoting *United States v. Mason*,

17  658 F.2d 1263, 1265 n.1 (9th Cir. 1981)).  The *Allen* charge, "while productive of continued

18  comment and debate, is nevertheless an instruction that has been accepted for many years."

19  *Mason*, 658 F.2d at 1265.  The *Allen* instruction is most often used in cases of "apparent juror

20  deadlock" to "admonish jurors to keep trying."  *Id.*  "In the archetypal *Allen* charge context, the

21  judge instructs a deadlocked jury to strive for a unanimous verdict."  *Weaver v. Thompson*, 197

22  F.3d 359, 365 (9th Cir. 1999).  "So long as the defendant has offered facts that fairly support an

23  inference that jurors who did not agree with the majority felt pressure from the court to give up

24  their conscientiously held beliefs in order to secure a verdict," a reviewing court must "proceed

25  to the *Allen* charge analysis."  *Id.*

26  ////

This court will assume that the trial court's supplemental jury instruction in this case constituted an "*Allen* charge." "There is . . . nothing talismanic about any single element either making the [*Allen*] charge valid or invalid; the fundamental question is whether the jury was improperly coerced, thus infringing the defendant's due process rights." *Id.* The Ninth Circuit Court of Appeals has identified several factors to assist a reviewing court in determining whether a supplemental jury instruction of this kind violates due process: "(1) the form of the instruction, (2) the time the jury deliberated after receiving the charge in relation to the total time of deliberation, and (3) any other indicia of coerciveness." *Berger*, 473 F.3d at 1090 (quoting *United States v. Steele*, 298 F.3d 906, 911 (9th Cir. 2002)). *See also Weaver*, 197 F.3d at 366.

Considering the first factor, the trial judge's supplemental instruction in this case: (1) informed the jurors that they had "the absolute discretion to conduct your deliberations in any way you deem appropriate;" (2) informed the jurors that their "goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented" and "without doing violence to your individual judgment;" (3) phrased the judge's comments as suggestions; and (4) emphasized that the trial judge was not "dictating or instructing you as to how to conduct your deliberations." While the instruction informed the jurors that they should not hesitate to change their views, it advised them to do so only if they were "convinced" their prior vote was "wrong." The instruction did not advise the jurors to acquiesce in the majority decision, but stressed that each juror should carefully weigh the evidence and "decide the case for yourself." The form of the instruction, and these comments in particular, minimized any coercive effect the supplemental instruction may have otherwise had. *See Navellier v. Sletten*, 262 F.3d 923, 943 (9th Cir. 2001) (the "essential question" in determining whether a judge's comments are coercive "is whether the court made clear to the jury that all matters of fact are for its determination"); *Moore*, 96 Cal.App.4th at 1119. *Cf. Jiminez*, 40 F.3d at 981 & n.5 (noting that failure to instruct jurors to hold on to conscientiously held beliefs "weighs heavily in favor of the conclusion that the defendant's right to a fair trial and impartial jury has been violated");

1    *Mason*, 658 F.2d at 1271 (finding an *Allen* charge improper where jury was informed that "[i]f,

2    on the other hand, the majority was for acquittal, the minority ought to ask themselves whether

3    they might not reasonably doubt the correctness of the judgment which was not concurred in by

4    the majority").

5           Turning to the second factor, the length of time the jurors in petitioner's case deliberated

6    after receiving the trial court's supplemental instruction suggests that the instruction did not

7    influence or coerce the verdict.  It appears from the record that the jury deliberated for another

8    six days after receiving the supplemental jury instruction before returning its guilty verdict.  CT

9    2315-17, 2344.  In cases involving far shorter time periods between the supplemental instruction

10   and the verdict, the Ninth Circuit has found no coercive effect resulting from an *Allen* charge.

11   *See*, *e.g., United States v. Bonam*, 772 F.2d 1449, 1450-51 (9th Cir. 1985) (finding no coercion

12   where there was one day in total of deliberation, one-and-a-half hours of which came after *Allen*

13   charge); *United States v. Lorenzo*, 43 F.3d 1303, 1307 & n.3 (9th Cir. 1995) (no coercion with

14   five-and-a-half hours of deliberation coming after *Allen* charge).

15          Turning to the third factor, this court concludes that there is no other indicia of coercion

16   in this case.  The trial court's supplemental instruction was not directed toward a specific juror or

17   set of jurors, but was addressed to the entire jury.  Further, the judge did not know which of the

18   jurors were in favor of any particular verdict, he did not ask for a numerical breakdown of the

19   jurors' votes, and he did not know the identity of the problem juror.  Under the circumstances

20   presented here, there is no indication from the record that the trial court's charge had a coercive

21   effect on the jury verdict.  *Cf. United States v. Williams*, 547 F.3d 1187, 1206 (9th Cir. 2008)

22   (reversible error to give *Allen* charge when the trial court is aware of the identity of the holdout

23   juror); *United States v. Ajiboye*, 961 F.2d 892, 893-94 (9th Cir. 1992) (reversal required if the

24   trial judge "inquires into the numerical division of the jury and then gives an *Allen* charge," or

25   "if the holdout jurors could interpret the charge as directed specifically at them – that is, if the

26   judge knew which jurors were the holdouts and each holdout juror knew that the judge knew he

1   was a holdout").  This is not a case in which "it's clear from the record that the charge had an

2   impermissibly coercive effect on the jury."  *Williams*, 547 F.3d at 1205.

3          The decision of the California Court of Appeal rejecting petitioner's claim of coercion of

4   the verdict through jury instruction error is not contrary to or an unreasonable application of the

5   federal due process standards set forth above and should not be set aside.  Under the

6   circumstances, and looking at the record as a whole, this court concludes that the trial judge's

7   supplemental instruction did not unduly coerce the jury to render a unanimous verdict or

8   otherwise render petitioner's trial fundamentally unfair.  Accordingly, relief on this claim should

9   be denied.

10                          **3.  Change of Venue**

11          Petitioner claims that his trial should have been moved out of Sacramento County

12   because of adverse pretrial publicity.  He contends that the trial court's denial of his motion for a

13   change of venue denied him due process, in violation of the Fourteenth Amendment.  Dckt. No.

14   1 at 73-90.

15          The California Court of Appeal denied this claim, reasoning as follows:

16                  Defendant contends the trial court erred in denying his motion for
                    a change of venue.  He contends there was no evidence to
17                  contradict the defense expert's well-founded opinion that there was
                    a reasonable probability that defendant could not receive a fair trial
18                  in Sacramento.  In a supplemental brief, defendant contends that if
                    defendant is deemed to have forfeited this contention by failing to
19                  renew the motion for change of venue after voir dire, the issue
                    should still be addressed on its merits to forestall a claim of
20                  ineffective assistance of counsel.

21                  When a trial court denies a motion for a change of venue without
                    prejudice, the defendant must renew the motion after voir dire of
22                  the jury to preserve the issue for appeal.  (*People v. Maury* (2003)
                    30 Cal.4th 342, 388-389.)  Defendant contends counsel was
23                  deficient in failing to renew the motion.  (*Strickland v. Washington*
                    (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)  Since a
24                  determination of whether defense counsel was deficient in failing
                    to renew the motion requires consideration of the merits of the
25                  motion, we address the issue on its merits.

26   ////

                                            45

In determining the reasonable likelihood that defendant cannot receive a fair trial in a particular county, courts examine several factors: "(1) the nature and extent of the publicity; (2) the size of the population of [the county]; (3) the nature and gravity of the offense, (4) the status of the victim and of the accused, and (5) whether political overtones are present." (*Williams v. Superior Court* (1983) 34 Cal.3d 584, 588, fn. omitted.)

In moving for a change of venue, defendant relied upon a public opinion poll survey conducted in the summer of 2002 by the National Jury Project and the testimony of Edward Bronson, a college professor who was an expert in change of venue. Professor Bronson prepared a comparative analysis of the effect of the number of newspaper articles on whether a motion for change of venue was granted. Of the 37 appellate cases that stated the number of articles, where there were 26 or more articles, a change of venue was granted almost half (42 percent) of the time.

Professor Bronson testified there was extensive publicity about this case. He identified 87 newspaper articles, which included letters to the editor that did not mention either the case or defendant. Almost all of the articles appeared in 1999 and 2000, except for one in 2002; most focused on the victim. Television coverage was concentrated in the first weeks after the shooting. The coverage was emotional; the victim was always portrayed positively and the defendant negatively.

There was extensive coverage of Bean's funeral. Five thousand people attended and people were lined up shoulder to shoulder as the motorcade passed. The governor, the mayor, and the chief of police all spoke at the funeral.

The media coverage mentioned defendant's criminal record and drugs. Television reports mentioned a history of violence, although newspaper reports correctly reported defendant had no history of violence. The chief of police held press conferences at which he held up defendant's rap sheet.

The population of Sacramento County was about one million persons.

Professor Bronson testified this case was special because it involved the first police officer killed in the line of duty in Sacramento County in 25 years. The reaction to Bean's death was a sort of hero worship. There were special memorials at the police department and in Del Paso Heights, where the shooting occurred; this predominantly Black community mourned Bean's death. Bean's football jersey was retired at his high school, his college, and at the Pig Bowl, an annual football game between the police and the sheriff's department. Professor Bronson believed Bean became a prominent person after his death.

46

In contrast, media coverage stereotyped defendant as a parolee with a life of crime.  Defendant was described as criminal, dangerous and threatening.

Professor Bronson testified the case raised political issues about the availability of guns, the sufficiency of bullet-proof vests, and the backlog of parole warrants, although these were minor factors.

The survey indicated there was a 56 percent recognition rate for this case.  That rate was not high for one of the many cases on which Professor Bronson worked; only four of his cases had a lower recognition rate.  Of the 56 percent who recognized the case, 58 percent said defendant was definitely or probably guilty, as did 38 percent of those who did not recognize the case.  On cross-examination, Professor Bronson admitted the recognition rate did not provide strong support for a change of venue.

In a 22-page opinion that analyzed each of the *Williams* factors, the trial court denied the motion for a change of venue.[9]  The court found the nature and extent of the publicity was not atypical, contrasting it with the extensive, continual and repetitive publicity in *Williams v. Superior Court, supra*, 34 Cal.3d 584, 589.  It found only 59 items mentioned defendant, the victim, or the case; of these, 46 were news articles and 13 were letters to the editor.  The vast majority appeared in the first two months after the shooting. Only one article appeared after September 16, 2000; it appeared February 9, 2002.  Most of the broadcasts were in February or March 1999.

The court found the opinion survey did not support a change of venue.  The survey was lacking in an important aspect; it did not ask if people had formed an opinion as to guilt and whether they could put that opinion aside.  Further, it asked for an on-the-spot judgment of guilt, not if the respondent was predisposed towards guilt.  The recognition factor of 56 percent was not particularly high, as Professor Bronson admitted.  The follow-up question describing the case was suggestive of guilt and thus flawed.

The gravity of the crime weighed in favor of a change of venue, as it was the most serious crime and the prosecution sought the death penalty.  As to the nature of the offense, the court noted it had no sexual overtones and was not an execution style murder.  The racial aspect of the case was neutralized by the fact the Black community mourned the white officer's death.

The victim had a certain status in the community compared to defendant, but the victim's status as a police officer was

---

[9]  The change of venue motion was heard by a different judge (Judge Norbert Ehrenfreund) than the judge who presided at trial (Judge Lloyd Connelly).

insufficient alone for a change of venue.  The hostility towards "cop-killers" would follow defendant to any county.  The court found no political overtones, rejecting the suggestion that the victim's status as a police officer raised political implications.

In conclusion, the court found the nature and extent of publicity did not prejudice a large portion of potential jurors.  Most of the publicity occurred in the past.  The survey was flawed in failing to ask if respondents could put aside what they heard and be impartial.  Sacramento was a large county, the nature of the crime was not particularly inflammatory, and there were no political overtones.  The gravity of the offense was the highest and the victim was a police officer, but courts did not routinely transfer cases where an officer was killed.

The court noted the motion could be renewed at the time of voir dire.

A change of venue shall be ordered "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county."  (Pen.Code, § 1033, subd. (a).)  On appeal, we independently review the trial court's determination of the reasonable likelihood of an unfair trial.  (*People v. Pride* (1992) 3 Cal.4th 195, 224.)  "On postconviction review, we must also examine the voir dire of prospective and actual jurors to determine whether pretrial publicity did in fact have a prejudicial effect. [Citation.]"  (*People v. Balderas* (1985) 41 Cal.3d 144, 177.)

Our independent review of the factors set forth in *Williams v. Superior Court, supra*, 34 Cal.3d at page 588, leads us to agree with the trial court that no change of venue was required.  Publicity about the crime was extensive when it occurred, but news reports had dropped off significantly.  There was only one in the prior two years.  "Time dims all memory and its passage serves to attenuate the likelihood that early extensive publicity will have any significant impact at the time of trial."  (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 943.)  This is not a case like *Williams v. Superior Court, supra*, where the coverage was continual and repetitive.  In *Williams*, the coverage remained static, with weekly or biweekly news coverage of the case and the preceding trial of defendant's brother, a codefendant.  (*Williams v. Superior Court, supra*, at pp. 589-590.)

The effect of the passage of time is reflected in the voir dire.  Although many prospective jurors had heard of the case, most could recall only the barest details, that a police officer was shot.  Of the twelve jurors seated, nine had been exposed to pretrial publicity, but five of those could not remember what they heard or read.  One had heard about a park being dedicated to Bean.  Two had heard or read something about jury selection beginning.  One had heard about the case "years ago."  This juror had heard

48

defendant's mother proclaim defendant's innocence to a television reporter in the court hallway.

The actual jurors' lack of familiarity with the case is similar to that in *People v. Balderas, supra*, 41 Cal.3d 144, 180.  As in *Balderas*, defendant had not used all his 26 peremptory challenges (Pen.Code, § 1070) when he accepted the jury.  "These facts are strong indicators that the jurors were fair, and that the defense itself so concluded.  [Citations.]"  (*People v. Balderas, supra*, at p. 180.) The passage of time weighs heavily against a change of venue.  (*People v. Edwards* (1991) 54 Cal.3d 787, 808.)

The size of the relevant community is a material factor.  "The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness.  [Citation.]"  (*People v. Balderas, supra*, 41 Cal .3d 144, 178.)  Sacramento County had over one million residents at the time of jury selection and was the eighth most populous county in the state.  This factor weighs against a change of venue.  (*People v. Pride, supra,* 3 Cal.4th 195, 224.)

"The peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'; the term 'gravity' of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict."  (*Martinez v. Superior Court* (1981) 29 Cal.3d 574, 582.)  Special circumstance murder is the gravest offense (*Williams v. Superior Court, supra*, 34 Cal.3d at p. 593), but this factor alone is not dispositive.  (*People v. Jennings* (1991) 53 Cal.3d 334, 360.)  The nature of the offense was not as sensational as that in *Williams*, the rape and murder of a young white virgin by two Black men.  Here, there were no sexual overtones or suggestion of an execution-style or tortuous killing.  (*Compare People v. Jennings, supra*, at p. 360; *Martinez v. Superior Court*, supra, at p. 582.)

The status of the victim and defendant do not weigh in favor of a change of venue.  The victim became prominent only as a result of media coverage of the killing.  (*See People v. Daniels* (1991) 52 Cal.3d 815, 852.)  "Communities undoubtedly have special hostility toward 'cop-killers,' but that aspect of the case would follow [defendant] to whatever community in which venue ultimately resides."  (*Odle v. Superior Court, supra*, 32 Cal.3d at p. 942.)  While defendant was portrayed as a criminal, he was not "a stranger to and friendless in the community[.]"  (*Williams v. Superior Court, supra*, 34 Cal.3d at p. 594.)

Political overtones contributing to the need for a change of venue have been found where the prosecutor and defense counsel are political rivals (*Maine v. Superior Court* (1968) 68 Cal.2d 375, 387); where the case led to a political conflict between the mayor

49

1    and police chief of Los Angeles (*Powell v. Superior Court* (1991)
     232 Cal.App.3d 785, 798-802); where the bribery indictment at
2    issue became a contentious issue in a political campaign (*Smith v.
     Superior Court* (1969) 276 Cal.App.2d 145, 148-149). No such
3    political overtones are present in this case.

4    The trial court did not err in denying defendant's motion for a
     change of venue.

5

6    Defense counsel exercised only two peremptory challenges to
     excuse jurors from the panel and only three challenges to excuse
7    alternate jurors. "'The failure to exhaust peremptories is a strong
     indication "that the jurors were fair, and that the defense itself so
8    concluded." [Citation.]' [Citation.]" (*People v. Dennis* (1998) 17
     Cal.4th 468, 524.) "We will not second-guess counsel's
9    preference for this particular jury over another, unknown jury
     panel. [Citations.]" (*People v. Maury, supra*, 30 Cal.4th 342, 391.)
10   Defense counsel was not deficient in failing to renew the motion
     after voir dire.

11   Dckt. No. 18 at 131-39.

12        The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of

13   impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). *See also Green v.

14   White*, 232 F.3d 671, 676 (9th Cir. 2000). If prejudicial pretrial publicity makes it impossible to

15   obtain an impartial jury, then the trial judge must grant the defendant's motion for a change of

16   venue. *Hayes v. Ayers*, 632 F.3d 500, 507-08 (9th Cir. 2011); *Gallego v. McDaniel*, 124 F.3d

17   1065, 1070 (9th Cir. 1997); *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988). However,

18   jurors are not required to be totally ignorant of the facts and issues involved in a case. *Irvin*, 366

19   U.S. at 722; *see also Murphy v. Florida*, 421 U.S. 794, 800 (1975); *United States v. Sherwood*,

20   98 F.3d 402, 410 (9th Cir. 1996). It is sufficient if the jurors can lay aside their impressions or

21   opinions and render a verdict based on the evidence presented in court. *Holt v. United States*,

22   218 U.S. 245 (1910); *United States v. Dischner*, 974 F.2d 1502, 1525 (9th Cir. 1992) (issue is

23   whether jurors could impartially judge the defendant, not whether they remembered the case),

24   *overruled on other grounds by United States v. Morales*, 108 F.3d 1031, 1035 n.1 (9th Cir.

25   1997).

26   ////

                                        50

1    The Ninth Circuit employs a two-pronged test to determine if a petitioner's rights to due

2    process and a fair and impartial jury have been violated by excessive and unfair publicity.

3    *Gallego*, 124 F.3d at 1070;  *Harris*, 885 F.2d at 1361; *Hart v. Stanger*, 935 F.2d 1007, 1014 (9th

4    Cir. 1991).  Specifically, a petitioner must show that prejudice should be presumed or that actual

5    prejudice existed.  *Turner v. Calderon*, 281 F.3d 851, 865 (9th Cir. 2002); *Hart*, 935 F.2d at

6    1014 (citing *Murphy*, 421 U.S. at 800).  The Supreme Court recently applied this two-pronged

7    analytical approach in *Skilling v. United States*, 561 U.S. ___, 130 S.Ct. 2896 (2010).

8    Prejudice may be presumed if the record "demonstrates the trial venue was saturated with

9    prejudicial and inflammatory publicity about the crime."  *Gallego*, 124 F.3d at 1070; *United

10   States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997).  Prejudice is presumed only in "the extreme

11   case."  *Skilling,* 130 S.Ct. at 2907; *Hayes*, 632 F.3d at 508; *Harris*, 885 F.3d at 1361.  For

12   instance, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), prejudice was presumed where the case

13   involved the televising of an in-jail twenty minute interrogation of the defendant by the police in

14   which the defendant confessed to the murder for which he was subsequently convicted.  In *Estes*

15   *v. Texas*, 381 U.S. 532 (1965), prejudice was presumed where the press was allowed to sit within

16   the bar of the court and to overrun it with television equipment.  And in *Sheppard v. Maxwell*,

17   384 U.S. 333, 357, 362 (1966), prejudice was presumed where media accounts contained

18   inflammatory, prejudicial information that was not admissible at trial, and where the press

19   involvement significantly interfered with the trial.

20   Actual prejudice, on the other hand, exists if the jurors demonstrated actual partiality or

21   hostility that could not be laid aside.  *Skilling*, 130 S.Ct. at 2917-23; *Hayes*, 632 F.3d at 510-11;

22   *Harris*, 885 F.2d at 1361.  "This inquiry focuses on the nature and extent of the voir dire

23   examination and prospective jurors' responses to it."  *Hayes*, 632 F.3d at 510.  *See also Irwin*,

24   366 U.S. at 728 (actual prejudice found where eight of the twelve empaneled jurors had already

25   formed the opinion that the defendant was guilty, and 268 of the 430 potential jurors were

26   excused for cause because they indicated some degree of belief in the defendant's guilt).  Actual

51

1   prejudice may also be found where the degree of adverse pretrial publicity has created a

2   community-wide sentiment against the defendant, such that the jurors' claims that they can be

3   impartial should not be believed. *Id.*; *Patton v. Yount*, 467 U.S. 1025, 1031 (1984).

4         The duty of a federal court reviewing such a claim in a habeas corpus proceeding is to

5   "make an independent review of the record to determine whether there was such a degree of

6   prejudice against the petitioner that a fair trial was impossible." *Harris*, 885 F.2d at 1360

7   (quoting *Bashor*, 730 F.2d at 1234). To this end, a "reviewing court must independently

8   examine the news reports for volume, content and timing." *Harris*, 885 F.2d at 1360. A court

9   must also consider whether the jurors had such fixed opinions they could not impartially judge

10   the guilt of the defendant. *Patton*, 467 U.S. at 1035.

11         This court accepts petitioner's assertion that there was extensive media coverage of his

12   case. However, after reviewing the state court record, the court finds that the nature of the news

13   coverage was primarily factual and not unduly inflammatory. Negative publicity is not

14   presumptively prejudicial. *See Harris*, 885 F.2d at 1362; *see also Nebraska Press Ass'n v.*

15   *Stuart*, 427 U.S. 539, 554 (1976) ("pretrial publicity even pervasive, adverse publicity does not

16   inevitably lead to an unfair trial"). As noted by the United States Supreme Court in *Murphy*, 421

17   U.S. at 801 n.4, "[w]e must distinguish between mere familiarity with petitioner or his past and

18   an actual predisposition against him, just as we have in the past distinguished largely factual

19   publicity from that which is invidious or inflammatory."

20         Further, although there was one newspaper article about the case published in 2002, most

21   of the media coverage took place several years before jury selection commenced. The coverage

22   was at its most intense the first few months after the crime occurred, which was more than two

23   years prior to trial. "The Supreme Court has repeatedly recognized that the passage of

24   significant time between adverse press coverage and a defendant's trial can have 'a profound

25   effect on the community and, more important, on the jury, in softening or effacing opinion.'"

26   *Skilling*, 632 F.3d at 509 (quoting *Patton*, 467 U.S. at 1033.) The trial court found that the

1   passage of time between the period of extensive media coverage of this case and the trial date

2   appeared to have diminished the likelihood that the publicity would have any significant impact

3   on the trial.  CT at 468.  The United States Supreme Court noted in *Skilling* that "[w]hen pretrial

4   publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good

5   sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and

6   may base her evaluation on her 'own perception of the depth and extent of news stories that

7   might influence a juror.'" 130 S.Ct. at 2918 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427

8   (1991).

9        After reading the newspaper articles and other material submitted by the petitioner, this

10  court concludes that the record does not reflect a "general atmosphere in the community or

11  courtroom [which was] sufficiently inflammatory and prejudicial to deny [petitioner his] right to

12  a fair and impartial jury at trial."  *See Harris*, 885 F.2d at 1363 (quoting *Murphy*, 421 U.S. at

13  802).  This court also notes that petitioner did not allege any significant disruption of his trial

14  proceedings by the news media, and he did not renew his motion for change of venue after the

15  conclusion of jury voir dire.  The news articles and media coverage of this case certainly did not

16  rise to the level of disruption that supported a presumption of prejudice in *Estes*, *Rideau*, and

17  *Sheppard*.  Under these circumstances, prejudice cannot be presumed.

18        This court also finds that there was no actual prejudice on the part of the jurors at

19  petitioner's trial.  While there was extensive information about the case in the local media, the

20  coverage was not nearly so prejudicial as that found in *Irvin*, which involved a "barrage of

21  newspaper headlines, articles, cartoons and pictures . . . unleashed against . . . [the defendant]

22  during the six or seven months preceding his trial." 366 U.S. at 725-26.  During voir dire, and as

23  explained by the California Court of Appeal, most of the prospective jurors could only recall

24  minor details about the case.  Although nine of the seated jurors had heard about the case, five of

25  them could not remember what they had read or heard.  Those who did remember something,

26  could only recall non-inflammatory details.  Every juror who had been exposed to publicity in

53

the case, and who had more than a vague or non-existent memory of what they read, affirmed

that they could be impartial, notwithstanding such exposure. *See, e.g.*, RT at 3183, 3216, 3235,

3238, 3246, 3313, 3329-30, 3404, 3407, 3428-29, 3455, 3458, 3494, 3558, 3573, 3589.  In any

event, "[e]ven where a prospective juror displays some prior knowledge of the facts and issues

involved in a case, it is his ability to 'lay aside his impression or opinion and render a verdict

based on the evidence presented in court' that is crucial." *Hayes*, 632 F.3d at 511 (quoting *Irvin*,

366 U.S. at 723.)  No juror stated that he or she would be unable to render a fair decision

because of the publicity about the case.[10]  Further, petitioner's counsel did not exercise all of his

peremptory challenges. *See Murphy*, 421 U.S. at 796 (noting that petitioner had exercised only

27 of his 32 peremptory challenges).  After a review of the record, the court finds that none of

the jurors' remarks during voir dire indicate partiality, fixed opinion, or the  inability to decide

the case based solely on the evidence presented at trial.

For the reasons set forth above, petitioner has failed to show that media coverage of his

arrest and trial denied him the right to a fair trial in the venue in which it was conducted.  The

decision of the California Court of Appeal to the same effect is not contrary to or an

unreasonable application of federal law.  Because petitioner suffered no presumed or actual

prejudice as a result of pretrial publicity, he is not entitled to relief as to this claim.

### 4.  Sufficiency of the Evidence

Petitioner claims that the evidence introduced at his trial was insufficient to support his

second degree murder conviction "because the prosecution did not establish implied malice or

that [petitioner] killed the victim while engaging in an unlawful act, inasmuch as there is

insufficient evidence of whether Officer Hogge fired at [petitioner] before [petitioner] began

firing his weapon."  Dckt. No. 1 at 91.  Petitioner argues that the evidence supports his theory

---

[10]  Even if the jurors' answers during voir dire indicated differently, however, even the
"existence of a [ ] preconceived notion as to the guilt or innocence of an accused, without more,
is [not] sufficient to rebut the presumption of a prospective juror's impartiality." *Irvin*, 366 U.S.
at 723.

1   that Officer Hogge fired first and that petitioner fired only later, in self-defense. *Id.* at 93-95.  He

2   argues that the prosecution's theory of the case was not supported by the facts and was

3   "improbable." *Id.* at 95.

4       The California Court of Appeal rejected these arguments, reasoning as follows:

5           Defendant contends there is insufficient evidence to support a
        conviction of second degree murder.  Specifically, he contends
6           there is insufficient evidence to establish malice because the
        prosecution failed to prove that defendant, not Hogge, fired first.

7

8           "To determine sufficiency of the evidence, we must inquire
        whether a rational trier of fact could find defendant guilty beyond a
        reasonable doubt.  In this process we must view the evidence in the
9           light most favorable to the judgment and presume in favor of the
        judgment the existence of every fact the trier of fact could
10          reasonably deduce from the evidence.  To be sufficient, evidence
        of each of the essential elements of the crime must be substantial
11          and we must resolve the question of sufficiency in light of the
        record as a whole.  [Citations.]"  (*People v. Johnson* (1993) 6
12          Cal.4th 1, 38.)

13          "Murder is the unlawful killing of a human being, or a fetus, with
        malice aforethought." (Pen.Code, § 1 87, subd. (a).)  Malice may
14          be express or implied.  Express malice requires a deliberate
        intention to kill unlawfully.  (Pen.Code, § 188.)  Malice is implied
15          "when no considerable provocation appears, or when the
        circumstances attending the killing show an abandoned and
16          malignant heart."  (*Ibid.*)  Implied malice has both a physical and a
        mental component.  The physical component requires an act
17          dangerous to human life; the mental component requires defendant

18          know his conduct endangers another, but acts with conscious
        disregard for life.  (*People v. Patterson* (1989) 49 Cal.3d 615,
19          626.)
        The Attorney General contends that Hogge's testimony is
20          sufficient to establish malice.  Hogge testified that after the second
        stop, defendant fired first, killing Bean.  Intentionally firing a shot
21          at a victim at close range is an act dangerous to human life and
        presents a high probability of death, so it is sufficient to establish
22          implied malice, even if the jury does not find an intent to kill.
        (*People v. Woods* (1991) 226 Cal.App.3d 1037, 1048; *see also*
23          *People v. Lee* (1987) 43 Cal.3d 666, 679 [firing at armed police
        officers shows an intent to kill as defendant places himself in a
24          "kill or be killed" situation].)  The testimony of a single witness is
        sufficient evidence to support the verdict.  (*People v. Zavala*
25          (2005) 130 Cal.App.4th 758, 766.)

26  ////

                                            55

Defendant contends Hogge's testimony does not provide substantial evidence because it is improbable.  To be substantial, evidence must be "of ponderable legal significance . . . reasonable in nature, credible, and of solid value.  [Citations.]"  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  Defendant contends Hogge's testimony is improbable because it is inconsistent with the physical evidence.  Hogge was wrong that defendant fired four to seven shots; only three shell casings from the Glock were found.  These shell casings were not where they should have been if, as Hogge testified, defendant fired immediately upon getting out of the car.

That Hogge's testimony was not completely consistent with the physical evidence found at the scene did not require that the jury disregard it entirely.  The People conceded Hogge's account of the number of shots fired at him and at Bean was incorrect.  It is hardly surprising that one being fired at would recall more shots than were actually fired.  Further, there was no indication that the scene of the killing was untouched before the crime scene investigators began their work.  Dozens of police officers responded to the scene, as well as medical personnel from the life flight crew.  Even the defense forensic scientist agreed the shell casings could have been inadvertently moved or kicked in the commotion.  Neither Hogge's nor defendant's testimony matched perfectly the physical evidence. The jury was required to make a credibility determination between two different versions of events.  The jury reasonably found Hogge more credible; substantial evidence supports the second degree murder verdict.

Dckt. No. 18 at 108-110.

There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).  A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case.  *Id.*

56

1    The court must review the entire record when the sufficiency of the evidence is

2    challenged in habeas proceedings.  *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

3    *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987).  It is

4    the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

5    reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  If the trier

6    of fact could draw conflicting inferences from the evidence, the court in its review will assign

7    the inference that favors conviction.  *Turner v. Calderon*, 281 F.3d 851, 881-82 (9th Cir. 2002).

8    The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but

9    whether the jury could reasonably arrive at its verdict.  *United States v. Mares*, 940 F.2d 455,

10   458 (9th Cir. 1991).  The federal habeas court determines the sufficiency of the evidence in

11   reference to the substantive elements of the criminal offense as defined by state law.  *Jackson*,

12   443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

13   Viewing the evidence in the light most favorable to the verdict, there was sufficient

14   evidence introduced at petitioner's trial to support the jury's verdict.  As explained by the

15   California Court of Appeal, Officer Hogge testified that petitioner fired the first shots, killing

16   Officer Bean in the process.  Although Hogge's testimony was not completely consistent with

17   the other evidence introduced at trial, the jury apparently found his version of the events more

18   credible that petitioner's version.  It was entirely within the jury's prerogative to do this.  *See*

19   *Harper v. City of Los Angeles*, 533 F.3d 1010, 1023-24 (9th Cir. 2008).  The testimony of

20   Officer Hogge was sufficient to support the verdict in this case.  *See United States v. Gudino*,

21   432 F.2d 433, 434 (9th Cir. 1970) ("The testimony of the one witness, if believed, was sufficient

22   to support the conviction, and the resolution of any question as to his credibility was properly

23   entrusted to the jury").

24   The conclusion of the state court that sufficient evidence supported the guilty verdict in

25   this case is not contrary or an unreasonable application of United States Supreme Court

26   authority.  Accordingly, petitioner is not entitled to relief on this claim.

1        **5.  Failure to Plead Enhancement for Sentence of Life Without Parole**

2              In petitioner's next ground for relief, he claims that he was denied his due process right

3   to notice of the penal consequences of the charges against him because the second degree murder

4   sentencing enhancement contained in Cal. Penal Code § 190(c), which formed the basis of the

5   sentence he received, was not alleged in the information.  Dckt. No. 1 at 112.  Petitioner argues

6   that he "did not receive notice from the charging instrument of the penal consequences sought by

7   the prosecution in this case."  *Id.*  Petitioner concedes he was given notice of the facts underlying

8   the § 190(c) enhancement by virtue of the firearm enhancement, the special circumstance

9   allegations, and the first degree murder charge contained in the information.  *Id.* at 114-15; *see*

10  *also* CT at 231.  However, he argues that the prosecution's failure to charge the enhancement in

11  the information was prejudicial because, in general: (1) "the punishment sought by the charging

12  document and the expectations it generates have profound effects on the plea bargaining

13  process;" and (2) "defendants' expectations of particular punishment also have an effect on his

14  decision to exercise important rights, like the right to a trial by jury."  Dckt. No. 1 at 116-17.

15  Petitioner argues that it was "unjust" to impose punishment that was "not sought by the charging

16  instrument."  *Id.* at 114.  Finally, petitioner argues that § 190(c) "requires that one of four

17  specific facts be *charged* and found true."  *Id.* at 117.[11]

18  _____

19        [11]  Cal. Penal Code § 190(c) provides:

20         (c) Every person guilty of murder in the second degree shall be punished by
        imprisonment in the state prison for a term of life without the possibility of parole
21      if the victim was a peace officer, as defined in subdivision (a) of Section 830.1,
        subdivision (a), (b), or (c) of Section 830.2, subdivision (a) of Section 830.33, or
22      Section 830.5, who was killed while engaged in the performance of his or her
        duties, and the defendant knew, or reasonably should have known, that the victim
23      was a peace officer engaged in the performance of his or her duties, and any of
        the following facts has been charged and found true:

24          (1) The defendant specifically intended to kill the peace officer.

25
            (2) The defendant specifically intended to inflict great bodily
26          injury, as defined in Section 12022.7, on a peace officer.

                                                    58

1      The California Court of Appeal denied this claim with the following reasoning:

2          Defendant contends he was denied the due process right to notice
           of the potential penal consequences of the Penal Code section 190,
3          subdivision (c) enhancement because it was not alleged in the
           information.  He contends this uncharged enhancement must be
4          stricken.

5          Penal Code section 190, subdivision (c) provides for a life
           sentence without the possibility of parole for every person guilty of
6          second degree murder of a peace officer killed in the performance
           of his duties, when the defendant knew, or should have known, the
7          victim was a peace officer engaged in the performance of his
           duties.  The jury must find the defendant intended to kill the peace
8          officer, intended to inflict great bodily injury on the peace officer,
           personally used a dangerous or deadly weapon, or personally used
9          a firearm.  (Pen.Code, § 190, subds.(c)(1)-(4).)

10         The amended information alleged two special circumstances for
           first degree murder: the victim was a peace officer engaged in the
11         performance of his duties (Pen.Code, § 190.2, subd. (a)(7)) and the
           murder was committed to avoid or prevent an arrest or to perfect or
12         attempt an escape from lawful custody (Pen.Code, § 109.2, subd.
           (a)(5)).  The penalty if either of these special circumstances is
13         found true is death or imprisonment for life without the possibility
           of parole.  (Pen.Code, § 190.2, subd. (a).)  The amended
14         information further alleged an enhancement under Penal Code
           section 12022.53, subdivision (d) for defendant's personal use of a
15         firearm.

16         Defendant objected to the instruction on the second degree murder
           enhancement because it was not alleged in the information.  The
17         trial court overruled the objection, finding an amendment to the
           information was not necessary because the Penal Code section
18         190, subdivision (c) enhancement was not a separate crime.  The
           jury found the enhancement true.
19
           Defendant concedes the 190.2, subdivision (a)(7) special
20         circumstance and the firearm enhancement gave him notice of the
           facts the prosecution would seek to prove, that he used a gun to kill
21         a peace officer in the performance of his duties.  Thus, he was
           given a reasonable opportunity to prepare his defense and not be
22     _____

23
           (3) The defendant personally used a dangerous or deadly weapon
24         in the commission of the offense, in violation of subdivision (b) of
           Section 12022.
25
           (4) The defendant personally used a firearm in the commission of
26         the offense, in violation of Section 12022.5.

1    taken by surprise at trial.  (*People v. Lohbauer* (1981) 29 Cal.3d
     364, 368.)

2

3    Defendant contends, however, that he was denied a second aspect
     of due process, notice of the consequences of proof of the fact the
     prosecution seeks to prove.  He further contends Penal Code 190,
4    subdivision (c) requires the facts supporting the enhancement be
     "charged and found true."

5

6    Penal Code section 1170.1, subdivision (e) requires that all
     enhancements be alleged in the accusatory pleading.  The Attorney
     General agrees that an uncharged enhancement cannot be imposed,
7    but contends here the enhancement was alleged factually; the only
     error was that the proper Penal Code section was not cited. The
8    Attorney General contends the enhancement need not be stricken
     because defendant was on notice of the facts sought to be proved,
9    that a murder enhancement was sought, and the consequences of
     the enhancement were life imprisonment without the possibility of
10   parole or death.

11   This case is similar to *People v. Neal* (1984) 159 Cal.App.3d 69.
     In *Neal*, defendant was charged with various sex crimes and
12   one-year weapon enhancements under Penal Code section 12022,
     subdivision (b).  After the jury convicted defendant and found the
13   use enhancement true, the trial court sentenced him under Penal
     Code section 12022.3, a more specific, three-year weapon
14   enhancement for certain sex offenses.  On appeal, defendant
     contended the enhancement must be modified to the lesser
15   enhancement charged.  The *Neal* court rejected the contention.
     "We believe that where the information puts the defendant on
16   notice that a sentence enhancement will be sought, and further
     notifies him of the facts supporting the alleged enhancement,
17   modification of the judgment for a misstatement of the underlying
     enhancement statute is required only where the defendant has been
18   misled to his prejudice. [Citations.]" ( Id. at p. 73.)  The California
     Supreme Court has approved this reasoning as "the proper
19   analysis."  (*People v. Thomas* (1987) 43 Cal.3d 818, 830.)

20   In this case, the trial court sentenced defendant under a less harsh
     sentencing enhancement than the one alleged in the information
21   based on the same facts as alleged in the information.  Defendant
     had notice of both the facts the prosecution sought to prove and the
22   potential consequences if those facts were proved.  There was no
     prejudice and the trial court did not err in sentencing defendant
23   under Penal Code section 190, subdivision (c).

24   Dckt. No. 18 at 147-65.

25        The Sixth Amendment to the United States Constitution guarantees a criminal defendant

26   the fundamental right to be clearly informed of the nature and cause of the charges against him in

                                            60

1   order to permit adequate preparation of a defense.  *Cole v. State of Arkansas*, 333 U.S. 196, 201

2   (1948).  Indeed, "[n]o principle of procedural due process is more clearly established than that

3   notice of the specific charge, and a chance to be heard in a trial of the issues raised by that

4   charge, if desired, are among the constitutional rights of every accused in a criminal proceeding

5   in all courts, state or federal."  *Id.  See also Lankford v. Idaho,* 500 U.S. 110, 127 (1991)

6   (defendant's death sentence set aside because the lack of adequate notice to defendant that the

7   trial court was considering imposing the death penalty "created an impermissible risk that the

8   adversary process may have malfunctioned"); *Strickland v. Washington*, 466 U.S. 668, 685

9   (1984) ("a fair trial is one in which evidence subject to adversarial testing is presented to an

10  impartial tribunal for resolution of issues defined in advance of the proceeding").  "The charging

11  document need not contain a citation to the specific statute at issue; the substance of the

12  information, however, must in some appreciable way apprise the defendant of the charges

13  against him so that he may prepare a defense accordingly."  *Gautt v. Lewis*, 489 F.3d 993, 1004

14  (9th Cir. 2007).  The notice provision of the Sixth Amendment is incorporated within the Due

15  Process Clause of the Fourteenth Amendment and is applicable to the states.  *Id.* at 1003.

16          Pursuant to the authorities cited above, petitioner was entitled under the Due Process

17  Clause to "reasonable notice and information of the specific charge against him and a fair

18  hearing in open court."  *Paterno v. Lyons*, 334 U.S. 314, 320 (1948).  Petitioner had such notice

19  and information.  By virtue of the murder charge, the special circumstance allegations, and the

20  weapon enhancement contained in the information, petitioner had notice of the facts that had to

21  be proved in order to impose the § 190(c) sentence enhancement.  As noted by respondent, "as

22  Petitioner prepared to defend against the special circumstance allegations he was necessarily

23  preparing to defend against the second degree murder enhancement."  Dckt. No. 18 at 86.

24  Petitioner was also on notice that the special circumstance allegations carried a penalty of life

25  imprisonment without the possibility of parole or death.  As explained by the California Court of

26  Appeal, petitioner "had notice of both the facts the prosecution sought to prove and the potential

1   consequences if those facts were proved." *Id.* at 150.  In light of this, petitioner was "given a

2   reasonable opportunity to prepare his defense and not be taken by surprise at trial." *Id.* at 148.

3           Petitioner has failed to demonstrate that he was unable to defend against the charges, or

4   the possible sentencing consequences of those charges, because of the failure of the prosecution

5   to specifically charge the § 190(c) enhancement.  In any event, as noted by the California Court

6   of Appeal, petitioner was sentenced under a less harsh sentencing enhancement that the one

7   alleged in the information.  Petitioner does not allege that his defense would have been

8   structured differently had the information contained the § 190(c) allegation.  Petitioner has also

9   failed to demonstrate, or to allege, that he was unable to effectively engage in plea negotiations

10  because the information did not allege a § 190(c) enhancement, or that his decision to proceed to

11  trial with a jury was influenced by the lack of a §190(c) enhancement.

12          Under the circumstances presented here, petitioner received adequate notice of the

13  charges against him and the penal consequences of those charges.  Accordingly, he is not entitled

14  to habeas relief on this claim.

15                          **6.  Ineffective Assistance of Trial Counsel**

16          Petitioner claims that he was denied his right to the effective assistance of trial counsel

17  because counsel: (1) failed to request an instruction on the lesser offense of "voluntary

18  manslaughter/manslaughter;" (2) failed to conduct sufficient investigation into his case; and (3)

19  forced petitioner to change his trial testimony.  Dckt. No. 1 at 119-24.  The allegations contained

20  in the petition with respect to these claims are extremely broad and do not explain the underlying

21  facts.  Although petitioner informs the court that his declaration provides the relevant facts, *id.* at

22  121, there is no declaration attached to the petition before this court.  Petitioner did attach a

23  declaration in support of his ineffective assistance of counsel claims to each of his state habeas

24  petitions.  *See* Resp.'s Lodg. Docs. 10, 12, 14.  This court will assume that petitioner intended to

25  attach that declaration to the instant petition, and will accept it as support for his claims of

26  ineffective assistance of counsel.

Petitioner first claims in the instant petition that his trial counsel rendered ineffective assistance in failing to request a jury instruction on the "lesser included or related offense" of "voluntary manslaughter/manslaughter."  Dckt. No. 1 at 120.  In his declaration, petitioner alleges that his trial counsel "failed to request for an lesser included or related offense."  Resp.'s Lodg. Doc. 10, Attach. A at consecutive p. 6.

Petitioner also claims that his trial counsel rendered ineffective assistance in "failing to conduct an investigation surrounding the evidence of my case."  Dckt. No. 1 at 120.  He alleges that his trial counsel "was so ineffective that he supported the prosecution in wrongfully convicting petitioner."  *Id.* at 123.  In his declaration, petitioner states that his trial counsel "failed to interview several witnesses who had made personal observations of the shooting."  Resp.'s Lodg. Doc. 10, Attach. A at consecutive p. 6.  He explains that counsel told him these witnesses "would not make good witnesses because they were drug dealers and users and jury would find them unbelievable."  *Id.*  Petitioner complains that his trial counsel "started a meager investigation about four months prior to my trial after being on the case for almost four years."  *Id.*

Finally, petitioner claims that his trial counsel rendered ineffective assistance when he "pressured" him to change his testimony at trial.  Dckt. No. 1 at 120.  In his declaration, petitioner states that his trial counsel "informed me to change my testimony regarding certain facts of the case and he told me I would get the death penalty if I didn't."  Resp.'s Lodg. Doc. 10, Attach. A at consecutive p. 5.  Petitioner explains that his attorney "wanted [him] to change certain facts regarding the manner in which I came out of the car, the route I took from the car and in the field as well."  *Id.* at consecutive p. 6.

The last reasoned decision on these claims was rendered by the California Superior Court.  Resp.'s Lodg. Doc. 11.  The Superior Court ruled as follows:

////

////

Petitioner challenges his 2003 conviction in this court on grounds of ineffective assistance of trial and appellate counsel.

In asserting ineffective assistance of trial counsel, "a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833, *citing Strickland v. Washington* (1984) 466 U.S. 668 and *People v. Pope* (1979) 23 Cal.3d 412; *see also In re Scott* (2003) 29 Cal.4th 783, 811-812.)

In applying the first part of the test, courts are directed to be highly deferential.  A petitioner claiming ineffective assistance must overcome a presumption that, considering all of the circumstances, counsel's actions "might be considered sound trial strategy." (*Strickland, supra*, 466 U.S. at p. 689.)

In the second part of the test, a petitioner "must also show prejudice flowing from counsel's performance or lack thereof.  [cites omitted]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [cites omitted]" (*Ibid.*)

Finally, courts are advised that it is frequently easier to resolve an ineffective assistance claim by looking first at the issue of prejudice; if none is established, then it will be unnecessary to consider counsel's performance.  (*In re Fields* (1990) 51 Cal.3d 1063, 1077.)

The standard for competent appellate counsel has been described as a duty to argue all issues that are arguable and not to argue against a client.  (*People v. Lang* (1974) 11 Cal.3d 134, 139.)  An arguable issue is one with sufficient merit so that it could potentially result in reversal or more favorable outcome.  (*In re Harris* (1993) 5 Cal.4th 813, 833.)

Petitioner has failed to allege prejudice.  First, the court gave the instructions on manslaughter that petitioner sought.  Petitioner states that he wanted certain witnesses called, but does not say what their testimony would have been or how it would have helped his case.  His counsel was correct in informing him that persons who are drug dealers or users are less believable to the jury. Petitioner does not say how his testimony, which he says counsel urged him to give, worked to his detriment.  It is doubtful that petitioner intends to confess to perjury; thus, counsel's advice must have been that petitioner testify properly.  Petitioner says that he was uncomfortable with certain jurors, but does not show that counsel had any valid basis for challenging them.

1   *Id.* at 1-2.

2          To support a claim of ineffective assistance of counsel, a petitioner must first show that,

3   considering all the circumstances, counsel's performance fell below an objective standard of

4   reasonableness.  *See Strickland*, 466 U.S. at  687-88.  After a petitioner identifies the acts or

5   omissions that are alleged not to have been the result of reasonable professional judgment, the

6   court must determine whether, in light of all the circumstances, the identified acts or omissions

7   were outside the wide range of professionally competent assistance.  *Id*. at 690; *Wiggins v.*

8   *Smith*, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by

9   counsel's deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice is found where

10  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

11  proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a probability

12  sufficient to undermine confidence in the outcome."  *Id*.

13         The California Superior Court concluded that petitioner failed to demonstrate prejudice

14  with respect to his claims of ineffective assistance of counsel.  This conclusion is not

15  unreasonable.  *See Knowles v.  Mirzayance*, 556 U.S. 111, ___, 129 S.Ct. 1411, 1420 (2009)

16  ("the question (in evaluating claims of ineffective assistance of counsel) 'is not whether a federal

17  court believes the state court's determination' under the *Strickland* standard 'was incorrect but

18  whether that determination was unreasonable – a substantially higher threshold.'") (quoting

19  *Schriro v.  Landrigan*, 550 U.S. 465, 473 (2007).  With regard to petitioner's claim that his trial

20  counsel improperly failed to request jury instructions on manslaughter, the Superior Court found

21  that the trial court "gave the instructions on manslaughter that petitioner sought."  Resp.'s Lodg.

22  Doc. 11 at 2.  This finding is supported by the record before this court; petitioner's jury was

23  instructed on voluntary and involuntary manslaughter.  *See* RT at 5780-85.  Petitioner has failed

24  to suggest any additional instructions on lesser offenses that his trial counsel should have

25  requested or how he was prejudiced by counsel's inaction.  Accordingly, this claim should be

26  denied.

1    With regard to petitioner's claim of a failure to investigate, the Superior Court essentially

2    concluded that petitioner's allegations were too vague and conclusory to support habeas relief.

3    This court agrees.  Petitioner alleges, in general fashion, that his trial counsel failed to conduct

4    sufficient investigation and failed to interview witnesses who had observed the shooting.  He

5    also contends that his counsel told him witnesses who used and sold drugs were not credible.

6    These allegations fail to establish either deficient performance or prejudice.  *See Jones v. Gomez*,

7    66 F.3d 199 at 204.  Petitioner does not explain what additional investigation he believes his trial

8    counsel should have conducted.  The implication that further investigation by counsel may have

9    uncovered helpful information is insufficient to establish prejudice.  *Villafuerte v. Stewart*, 111

10   F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he

11   presented no evidence concerning what counsel would have found had he investigated further, or

12   what lengthier preparation would have accomplished).

13   Petitioner has also failed to specify the witnesses who should have been interviewed or

14   the information they would have given at trial.  His claim that unnamed persons should have

15   been called as witnesses is unduly vague and conclusory.  *See Dows v. Wood*, 211 F.3d 480, 486

16   (9th Cir. 2000) (no ineffective assistance of counsel where there was no evidence in the record

17   that a helpful witness actually existed and petitioner failed to present an affidavit establishing

18   that the alleged witness would have provided helpful testimony for the defense); *United States v.*

19   *Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of

20   ineffectiveness claim because he offered no indication of what potential witnesses would have

21   testified to or how their testimony might have changed the outcome of the hearing).  Further,

22   "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which

23   witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every

24   trial."  *United States v. Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987).  Reasonable tactical

25   decisions, including decisions with regard to the presentation of the case, are "virtually

26   unchallengeable."  *Strickland*, 466 U.S. at 690.  Here, there is no evidence before this court that

66

1  trial counsel's decisions with respect to the calling of witnesses was unreasonable.  Nor was

2  counsel unreasonable in telling petitioner the obvious truth that incredible witnesses should not

3  be called to the stand.

4    Petitioner has also failed to establish ineffective assistance of counsel with respect to his

5  claim that his trial counsel pressured him to change his testimony.  Petitioner has not described

6  the testimony in question or the exact advice given to him by his trial counsel.  Nor does he state

7  that any of his trial testimony was false.  As noted by the California Superior Court, under these

8  circumstances a reviewing court can only presume that counsel advised petitioner to "testify

9  properly."  This does not constitute ineffective assistance.

10    The decision of the California courts denying petitioner's claims of ineffective assistance

11  of trial counsel is not contrary to or an unreasonable application of *Strickland*.  Accordingly,

12  petitioner is not entitled to relief on these claims.

13      **7.  Denial of Motion for Substitute Counsel**

14    Petitioner's next claim is that the trial court violated his Sixth Amendment right to

15  counsel when it denied his motion for substitute counsel pursuant to *People v. Marsden*, 2 Cal.3d

16  118 (1970).  He states that he had an "overriding distrust of his counsel" which "effectively

17  precluded effective communication and representation" and which was "evidenced by

18  petitioner's perceptions that [counsel] not only thought he was guilty, but collaborated with the

19  prosecutor, forced petitioner to change facts regarding his testimony, and engaged in other

20  wicked means to ensure a guilty verdict against him."  Dckt.  No. 1 at 127.

21    The state court record reflects that on March 28, 2003, attorney Clyde Blackmon filed a

22  *Marsden* motion on petitioner's behalf, seeking to discharge petitioner's lead counsel Donald

23  Masuda.  CT at 1243-1251 (filed on July 21, 2011, under seal).  The motion alleged that Mr.

24  Masuda "had failed to investigate certain issues pertaining to both the guilt and penalty phases of

25  [petitioner's] trial."  *Id.* at 1243-44.  In response, on April 10, 2003, attorney Masuda filed a

26  motion to withdraw as counsel for petitioner, arguing that "a conflict exists between himself and

the defendant which [has] resulted in a total breakdown of the relationship between the client

and attorney." *Id.* at 1268 (filed on July 21, 2011, under seal).  Mr. Masuda also stated that "at

this juncture the relationship that once existed between this counsel and Mr. Wright has been

irrevocably broken" and that counsel was not able to render effective assistance to petitioner as a

result. *Id.* at 1270.

The trial court conducted a hearing on petitioner's *Marsden* motion on April 17, 2003.

*Id.* at 2294-2379 (filed on July 21, 2011, under seal).  At that hearing, petitioner requested that

both lead counsel Mr. Masuda and *Keenan* counsel[12] Mr. McEwan be relieved and that another

attorney be appointed to represent him.  *Id.* at 2295.  Mr. Masuda responded that whether he still

wished to withdraw as petitioner's counsel "depended upon naturally what happens in the

*Marsden* motion.  *Id.* at 2296.  During the hearing, it appeared that a dispute had arisen among

petitioner's lead counsel, two *Keenan* counsel, and one of the investigators regarding the defense

strategy and plans for moving forward with the case.  *Id.* at 2303-12.  Petitioner's complaints

appeared to be centered largely on *Keenan* counsel McEwan.  *Id.* at 2313-17.  When asked to

explain his problems with Mr. Masuda, petitioner stated:

> Only thing I can say about Mr. Masuda, um, our communication
> has been kind of off.  As far as that, I really like being in the blind
> is like he handled my case to the best of his ability to my opinion.
> It is kind of hard to say because I know certain issues need to be
> done as far as the crime scene ballistics, or the witnesses.

*Id.* at 2317.  Petitioner also stated that "it has been kind of touchy when we communicate as far

as my legal defense," and that "out of the four years, three and a half years I have had him on my

case, um, when he has something to present to me he came to see me." *Id.*  Petitioner further

stated that he "really didn't see" Mr. Masuda much and that he was "not being able to speak

directly to Mr. Masuda." *Id.* at 2318.  Petitioner agreed with the trial judge's assessment of the

---

[12] *See Keenan v. Superior Court*, 31 Cal.3d 424, 430 (1982) (trial court has discretion under statutes governing appointment of counsel to appoint a second attorney to assist in the defense of a capital case).  The trial court appointed two *Keenan* counsel to assist Mr. Masuda in petitioner's defense.  CT at 2296-97.

situation, as follows: "you don't believe Mr. Masuda has been making himself available to you

enough on a regular basis to that you have a thorough understanding about what's going on in

your case." *Id.* at 2319. Petitioner also stated that he thought "a lot more investigation should

have been done." *Id.* at 2320. He specifically referred to a failure to interview all of the officers

at the scene, and unresolved issues regarding "ballistic experts." *Id.* at 2321. When asked

whether he trusted Mr. Masuda, petitioner stated,

> Your Honor, to be truthful it's up in the air right now. Um, I heard
> a lot of many good things about Mr. Masuda. I know he is a good
> attorney. I just met him through this incident here and with all this
> going on, it is kind of hard for me to trust anyone.

*Id.* at 2322.

At that point, Mr. Masuda explained his defense strategy to the court and to petitioner.

*Id.* at 2324-2336. He also explained internal conflicts and disagreements between petitioner's

defense team and the investigators. *Id.* Counsel stated that he took "strong issue" with

petitioner's allegation that he didn't spend enough time with him. *Id.* at 2328. He agreed that

between the time the *Marsden* motion was filed and the hearing on that motion, he "reduced

substantially the communication" between himself and petitioner. *Id.* at 2336. There then

ensued a lengthy discussion about a conflict between counsel McEwan and investigator Cerrito.

*Id.* at 2342-46. Counsel Masuda expressed his intention to "smooth over all the existing

problems and make sure [the case] is fully investigated." *Id.* at 2347. When asked for his

closing arguments, petitioner directed his complaints to attorney McEwan. *Id.* at 2356-58.

After hearing the input of all concerned, the trial judge issued his ruling on the *Marsden*

motion. *Id.* at 2358. He stated that "the *Marsden* standard here is whether or not the attorney

has acted properly in investigating and preparing the case," and concluded that "any reasonable

reading of what's before me in regards to that issue doesn't support terminating Mr. Masuda."

*Id.* at 2359. The trial judge attributed the lack of progress in petitioner's case to "the turmoil

that's existed in the defense team for the last few weeks." *Id.* at 2360. He opined that the failure

to make progress on the investigation "has eroded [petitioner's] confidence in Mr. McEwan and

the status of the case as whole, whatever the reason." *Id.*  However, the court concluded that

"given the totality of his circumstances and specifically the other work that has been done that

has been put forth here with regard to the penalty phase, it does not justify or support the

granting of a *Marsden* motion." *Id.* at 2361.  The judge stated, "what it does do, Mr. Masuda, is

place upon you a burden to get Mr. McEwan and Ms. Cerrito in a room, posthaste, to resolve this

issue and then, as appropriate, have follow-up communication with [petitioner]." *Id.*  He stated:

> When I look at Mr. Masuda's declaration and consider his
> comments here, I listened with care to Mr. Wright and I pushed
> him on this issue.  Mr. Masuda has backed off from the pattern of
> communications during the *Marsden* time, as it were.  But there
> was extensive communication, which he's indicated here, prior to
> that time; and it was a healthy communication, is an inference I am
> drawing, between Mr. Masuda and Mr. Wright.  Not that they
> always agreed, but they talked.  Sometimes, I imagine, frankly.
> But they talked.

*Id.* at 2362.  The court also concluded that "it doesn't rise to the level of the kind of breakdown

in communication that the Court's – a *Marsden* request to fire Mr. Masuda and Mr. McEwan and

hire new counsel." *Id.* at 2364.  The trial court also concluded that keeping the defense team was

in petitioner's best interests and that any problems with communication could be worked out

between petitioner and his defense team.  *Id.* at 2378.

The California Superior Court denied petitioner's *Marsden* claim, along with his claim

that his appellate counsel rendered ineffective assistance in failing to challenge the denial of the

*Marsden* motion, with the following reasoning:

> Petitioner also asserted that appellate counsel should have
> challenged denial of a *Marsden* motion.  To prevail on this issue, a
> defendant must show that his right to counsel would be
> "substantially impaired" if current counsel continued to represent
> him.  (*See People v. Walker* (1976) 18 Cal.3d 232, 238.)  Not all
> conflict between a defendant and counsel rises to this level.  For
> example, mistrusting counsel is not enough.  (*People v. Berryman*
> (1993) 6 Cal.4th 1048.)  Disagreeing about tactics, or which
> motions to make is similarly insufficient.  (*People v. Silva* (1988)
> 45 Cal.3d 604; *People v. Carter* (2005) 36 Cal. 4th 1114.)
> Petitioner indicated only that his counsel thought that he was guilty

70

1   and that counsel was "uppity and unprepared."  Defense counsel
    routinely represent defendants they think are guilty.  Petitioner's
2   discomfort with counsel does not otherwise indicate that denial of
    a *Marsden* motion should have been appealed.
3

4   Resp.'s Lodg. Doc. 11 at 2.

5           Under the Sixth Amendment to the United States Constitution, an indigent state prisoner

6   is entitled to the assistance of counsel at every critical stage of the proceedings.  *Gideon v.*

7   *Wainwright*, 372 U.S. 335 (1963).  Such assistance must be effective and competent.  *Strickland*,

8   466 U.S. at 668.  In addition, the Sixth Amendment guarantees a defendant a right to

9   conflict-free representation.  *See Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994).

10  However, indigent defendants do not have a constitutional right to be represented by their

11  counsel of choice.  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 625 (1989);

12  *United States v. Rewald*, 889 F.2d 836, 856 (9th Cir. 1989) (recognizing that the right to choice

13  of counsel is limited to defendants who can retain counsel).  Nor does the Sixth Amendment

14  guarantee a "meaningful attorney-client relationship."  *Morris v. Slappy*, 461 U.S. 1, 13–14

15  (1983) (internal quotation marks omitted).  "[T]he essential aim of the [Sixth] Amendment is to

16  guarantee an effective advocate for each criminal defendant rather than to ensure that a

17  defendant will inexorably be represented by the lawyer whom he prefers."  *Wheat v. United*

18  *States*, 486 U.S. 153, 159 (1988).  "[T]here is no automatic right to a substitution of counsel

19  simply because the defendant informs the trial court that he is dissatisfied with appointed

20  counsel's performance."  *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990).

21          In reviewing a federal habeas claim based on the denial of a motion for substitution of

22  counsel, "the ultimate constitutional question the federal courts must answer" is whether the state

23  trial court's disposition of the motion violated a petitioner's constitutional rights because the

24  conflict between the petitioner and appointed counsel "had become so great that it resulted in a

25  total lack of communication or other significant impediment that resulted in turn in an

26  attorney-client relationship that fell short of that required by the Sixth Amendment."  *Schell v.*

                                              71

1   *Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000).  As explained by the Ninth Circuit:

2          [t]he test for determining whether the trial judge should have
           granted a substitution motion is the same as the test for
3          determining whether an irreconcilable conflict existed. The court
           must consider: (1) the nature and extent of the conflict, to
4          determine whether the conflict deprived the defendant of
           representation guaranteed by the Sixth Amendment; (2) whether
5          the trial judge made an appropriate inquiry into the extent of the
           conflict; and (3) the timeliness of the motion to substitute counsel.

6

7   *Daniels v. Woodford*, 428 F.3d 1181, 1197–98 (9th Cir. 2005).

8          Here, the state court's decision denying petitioner's *Marsden* claim was neither contrary

9   to nor an unreasonable application of clearly established Federal law.  28 U.S.C. § 2254(d).  As

10  set forth above, the trial court held a thorough and fair hearing on petitioner's motion for

11  substitute counsel.  At that hearing, the court allowed petitioner to explain his complaints about

12  counsel, and tested the validity of those complaints by questioning counsel about the nature of

13  the problems.  Although petitioner was unhappy with some members of his defense team, it

14  appears that the communication between himself and his lead counsel was satisfactory.  It is true

15  that "a defendant's Sixth Amendment right to counsel is violated if the defendant is unable to

16  communicate with his or her counsel during key trial preparation times."  *Daniels*, 428 F.3d at

17  1197.  However, at the conclusion of the hearing on the *Marsden* motion, counsel pledged to

18  repair the problems within the defense team and work with petitioner.  The record reflects no

19  further problems during trial with respect to the communication between petitioner and his

20  defense team.  Indeed, at a hearing on June 23, 2003, shortly after the hearing on the *Marsden*

21  motion, petitioner's lead counsel informed the trial court that he and petitioner had "cleared the

22  air and we are working on the same cylinders here."  RT at 2497 (filed on July 21, 2011, under

23  seal).  All of this belies any claim that the communication problems between petitioner and his

24  lead counsel had become "irreconcilable."

25         Breakdowns in the attorney-client relationship that rise to the level of a conflict of

26  interest warranting substitution of counsel have been marked by (1) "a complete communications

72

1   breakdown," *see United States v. Nguyen*, 262 F.3d 998, 1004–05 (9th Cir. 2001); (2) an

2   attorney's "open opposition" to his client, including "bad language and threats" to provide

3   substandard performance if the client persisted in demanding to go to trial, that left the defendant

4   "effectively unrepresented," *United States v. Adelzo–Gonzalez*, 268 F.3d 772, 779 (9th Cir.

5   2001); or (3) "an atmosphere of mistrust, misgivings and irreconcilable differences." *United

6   States v. Moore*, 159 F.3d 1154, 1159 (9th Cir. 1998).  Although in this case petitioner may have

7   been dissatisfied with some aspects of his defense, the hearing on the motion reflected that there

8   was no irreconcilable conflict warranting removal of counsel.  *See Plumlee v. Masto*, 512 F.3d

9   1204, 1211 (9th Cir. 2008) (en banc) ("Petitioner has cited no Supreme Court case – and we are

10  not aware of any – that stands for the proposition that the Sixth Amendment is violated when a

11  defendant is represented by a lawyer free of actual conflicts of interest, but with whom the

12  defendant refuses to cooperate because of dislike or distrust").  "The Supreme Court has held

13  that a defendant is constitutionally entitled to a lawyer who is free of conflicts of interest and

14  who can act as a loyal advocate." *Id.* at 1211.  Petitioner received that here.  After independently

15  reviewing the record, the undersigned finds that the state court's denial of this claim was not an

16  unreasonable application of clearly established Supreme Court authority.  Accordingly, this

17  claim should be denied.

### 8.  Ineffective Assistance of Appellate Counsel

18

19          Petitioner claims that he received ineffective assistance of appellate counsel because

20  counsel failed to raise on appeal the two preceding claims (ineffective assistance of trial counsel

21  and improper denial of his *Marsden* motions).  Dckt. No. 1 at 128-29.  The California Superior

22  Court denied this claim, reasoning as follows:

23          Finally, to the extent that petitioner wanted appellate counsel to
            raise any of the issues just discussed (regarding ineffective
24          assistance of trial counsel), appellate counsel could not be
            expected to prevail on these issues because trial counsel was not
25          ineffective as to them.  Appellate attorneys are expected to raise on
            appeal only those issues on which a defendant has an arguable
26          likelihood of success.

73

Resp.'s Lodg. Doc. 11 at 2.

The *Strickland* standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." *Id*. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." *Id*. *See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.") There is, of course, no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. *See Miller*, 882 F.2d at 1434. In order to establish prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. *Id*. at 1434 n.9.

As discussed above, petitioner's *Marsden* claim and his claims of ineffective assistance of trial counsel lack merit. Thus, appellate counsel's decision to press other claims but not these two claims was "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Given the lack of merit of the two claims, petitioner has also necessarily failed to demonstrate that he probably would have prevailed if his appellate counsel had raised these claims on appeal. He has therefore failed to establish prejudice. *See Rhoades v. Henry*, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel did not render ineffective assistance in failing to investigate or raise an argument on appeal where "neither would have gone anywhere"); *Miller*, 882 F.2d at 2434 n.9. Accordingly, petitioner is not

1  entitled to relief on this claim.

2          **9.  Cumulative Error**

3          Petitioner claims that he was denied due process as a result of the cumulative impact of

4  the errors at his trial, including those of trial and appellate counsel.  Dckt. No. 1 at 130.  The

5  California Superior Court rejected this claim, stating, "finally, a claim of cumulative error fails

6  when other error has not been shown."  Resp.'s Lodg. Doc. 11 at 2.

7          The Ninth Circuit has concluded that under clearly established United States Supreme

8  Court precedent, the combined effect of multiple trial errors may give rise to a due process

9  violation if it renders a trial fundamentally unfair, even where each error considered individually

10  would not require reversal.  *Parle v. Runnels*, 505 F.3d 922, 927 (9th. Cir. 2007) (citing

11  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) and *Chambers v. Mississippi*, 410 U.S.

12  284, 290 (1973)).  *See also Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if no error of

13  constitutional magnitude occurred at trial, "no cumulative prejudice is possible").  "The

14  fundamental question in determining whether the combined effect of trial errors violated a

15  defendant's due process rights is whether the errors rendered the criminal defense 'far less

16  persuasive,' *Chambers*, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or

17  influence' on the jury's verdict."  *Parle*, 505 F.3d at 927 (quoting *Brecht*, 507 U.S. at 637).

18          This court has addressed each of petitioner's claims raised in the instant petition and has

19  concluded that no error of constitutional magnitude occurred at his trial in state court.  This court

20  also concludes that the alleged errors, even when considered together, did not render petitioner's

21  defense "far less persuasive," nor did they have a "substantial and injurious effect or influence

22  on the jury's verdict."  Accordingly, petitioner is not entitled to relief on his claim of cumulative

23  error.

24  ////

25  ////

26  ////

1    **V.  Conclusion**

2           For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

3    application for a writ of habeas corpus be denied.

4           These findings and recommendations are submitted to the United States District Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

6    days after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

9    within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

10   *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

11   his objections petitioner may address whether a certificate of appealability should issue in the

12   event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

13   Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

14   enters a final order adverse to the applicant).

15   DATED:   April 9, 2012.

16

17               EDMUND F. BRENNAN
                 UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26